JERRY ROSSMAN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11871. Promulgated March 19, 1948.

*Bernard Weiss, Esq.*, for the petitioner.
*Thomas R. Wickersham, Esq.*, for the respondent.

## OPINION.

LeMire, *Judge*: In its amended petition herein the petitioner alleges as error:

(a) The Commissioner has failed to allow as a deduction under Section 23 (a) or (q) of the Internal Revenue Code or in the computation of gross income under Section 22 (a) of the Internal Revenue Code a payment of Three Thousand Three Hundred Thirty Dollars and Seventy-eight Cents ($3,330.78) made to the Treasurer of the United States (Office of Price Administration).

Section 23 (a) deals generally with expense deductions, while section 23 (q) relates to "Charitable and Other Contributions by Corporations." Section 23 (q) (1) authorizes the deduction of "contributions or gifts" to "The United States, any State, Territory, or any political subdivision thereof."

We held in *Scioto Provision Co.*, 9 T. C. 439, that an amount paid to OPA in settlement of a claim for treble damages asserted for alleged violation of ceiling price regulations on meat products was not deductible as a business expense. In *Garibaldi & Cuneo*, 9 T. C. 446, we disallowed the deduction of an amount paid to the United States Government in settlement of a suit brought by OPA for violation of ceiling price regulations on bananas. We said in the *Scioto Provision Co.* case that to allow the deduction claimed would result in a

partial mitigation of the penalty to which the taxpayer had subjected itself and would be contrary to public policy.

The petitioner here seeks to distinguish both of the cited cases on the facts. It points out that the OPA had never instituted any action against it for violation of OPA regulations and that the payment to OPA was made voluntarily to correct overcharges that were unavoidable.

It is not too clear from the evidence that the overcharges in question might not have been avoided if the petitioner had adopted other more appropriate accounting measures.

While it is stipulated in paragraph 6 of the stipulation that the petitioner computed the selling price of its merchandise "in accordance with the method prescribed by Maximum Price Regulation No. 127, making allowance for shrinkage in accordance with the actual figures specified in the finishers' contracts," it is further stipulated in paragraph 7 that, due to undershrinkage of certain lots of goods, "prices had exceeded the maximum allowable under Office of Price Administration regulations."

However that may be, the petitioner itself discovered, belatedly, that it had overcharged for its goods in violation of OPA regulations and made the payment in dispute, as stated in its transmittal letter, in "settlement of the Price Administration's cause of action." In the *Scioto Provision* case, *supra*, the payment was made to OPA in settlement of a like cause of action. The only difference between the cases is that OPA there had asserted a claim for treble damages, whereas no claim had been asserted against the petitioner and no violation of the regulations had been charged against it. We do not think that fact can distinguish the cases. While the petitioner's voluntary and forthright disclosure of its violation and the forfeiture of the overcharges were highly commendable on its part, they add nothing to the petitioner's right to a deduction under the income tax laws. This Court has no power to reward litigants for their commendable conduct, as do courts with penal jurisdiction, or to mitigate in any way the hardships that sometimes result from application of the taxing statutes. As to considerations of public policy, a payment made in settlement of a cause of action resulting from voluntary disclosures stands on no different footing from one made under compulsion of the law; otherwise, a morally guilty person who resorts to the expediency of disclosing his offense might be favored over an inadvertent violator who protests his innocence.

There is no merit in either of the petitioner's contentions that the amount of the overcharges should be treated as a credit to sales account, in determining gross income under section 22 (a), or deducted as a contribution to the United States Government under section 23 (q).

Obviously, the payment did not result in any abatement of sales. Nothing was ever refunded or credited to sales customers. The evidence is that it would have been impracticable to make refunds to petitioner's customers, and for that reason the payment was made to OPA. Since petitioner's customers purchased the goods from the petitioner in their regular course of trade or business, they had no right of action against the petitioner. The OPA alone had that right of action. See section 205 (e) of the Emergency Price Control Act of 1942.

The payment to OPA had no element of a public donation such as may be deducted under section 23 (q). It was actuated not by philanthropic motives, but by the desire of petitioner's president to absolve the petitioner from any stigma of price ceiling violations and, as stated by the petitioner in its letter of transmittal, to settle OPA's cause of action against it. Undoubtedly, the settlement of the cause of action constituted valid consideration for the payment.

We think that the respondent did not err in disallowing the amount in dispute as a deduction from gross income.

Reviewed by the Court.

*Decision will be entered for the respondent.*

OPPER, *J.*, dissenting: The historic process of the common law sometimes described as "pricking out the line" calls for zealous alertness on the part of courts to recognize and seize upon sets of facts which, though superficially repetitious and similar, are actually novel and opposite. That seems to me a lesson we are failing to apply here.

The underlying issue of principle in such cases as the present is solely one of public policy. See *Heininger* v. *Commissioner*, 320 U. S. 467. Unless a policy can be ascertained which condemns petitioner's conduct and hence requires that the disputed amounts be included in petitioner's gross income or be denied as a deduction, their treatment as ordinary business items is proper. *Heininger* v. *Commissioner*, *supra*. But it is difficult to perceive where petitioner's actions fell short of the highest degree of conscientious and painstaking compliance with morals as well as law.

In *Hecht Co.* v. *Bowles*, 321 U. S. 321, the opinion points out that "there is no doubt, however, of petitioner's good faith and diligence." The facts would amply warrant an identical finding here. In the *Hecht Co.* case it further appeared, as it does here, that "Petitioner undertook to make repayment of all overcharges brought to light by the investigation in case of customers who could be identified. It proposed to contribute the remaining amount of such overcharges to some local charity," rather than as here to the Government itself.

Under those circumstances "The District Court concluded that the issuance of an injunction * * * would be 'unjust' to petitioner and not 'in the public interest.'" Its refusal was sustained by the highest Court.

A similar approach serves if we deal with the issue as one of precedent rather than of principle. The cases apparently thought to be those marking out the line to be followed here are readily seen to fall upon the opposite side. In neither was there any such factor as that appearing from the stipulation before us that "Petitioner computed the selling price of its merchandise in accordance with the method prescribed by the Maximum Price Regulations * * *." In fact, in the *Garibaldi & Cuneo* case [1] the opinion takes pains to point out "that they [the violations] could have been avoided by the exercise of reasonable care."

Nor was there in either of those cases such a voluntary disclosure by petitioner as we have here, made as soon as the unavoidable violations had been discovered and under circumstances where one suspects the violations could and probably would have escaped discovery or at least prosecution. See *Hecht Co.* v. *Bowles, supra.* The language of the *Scioto* [2] case is that "The petitioner was charged with violation of the price ceilings fixed by OPA and, under threat of a suit for treble damages and revocation of its slaughtering license, it agreed to pay * * *." Certainly that approach is not admissible here.

Finally, we know that an embezzler violating both the moral and the legal code is not chargeable with the enjoyed proceeds of his wrongdoing. *Commissioner* v. *Wilcox*, 327 U. S. 404. But this petitioner, conforming in every respect to the highest standards of decent conduct, is to be taxed upon income which it does not claim and has refused to retain. From the conclusion that any such inconsistency is required, I respectfully dissent.

ARUNDELL, VAN FOSSAN, LEECH, HARRON, and KERN, *JJ.*, agree with this dissent.

———

HARLAN, *J.*, dissenting: The distinction between the case at bar and *Scioto Provision Co.*, 9 T. C. 439, and *Garibaldi & Cuneo*, 9 T. C. 446, would seem to be obvious. In both of the above cases the violation of the law was patent. In fact, in the *Garibaldi & Cuneo* case there was some evidence of a flaunting of the law and in both of these cases the process of presenting and collecting a penalty had actually been instituted. In the case at bar the record does not disclose that there was ever a violation of the OPA law. If there was, the record dis-

[1] 9 T. C. 446.
[2] 9 T. C. 439.

closes that it would be difficult, if not impossible, to prosecute and neither had the Government presented a claim, nor is there any evidence that the Government anticipated presenting a claim for penalty.

When the taxpayer herein reported its mistake in pricing, the representative of the OPA, far from claiming that any violation of law or regulations had occurred, merely "advised" the taxpayer to return the overcharge to the various customers. The taxpayer, for reasons not disclosed by the record, claimed that this would be "impracticable." We can only infer that probably the amount of shrinkage in each case would be little more than guesswork and, since the amount of shrinkage apparently varied with each sale, with the average overcharge amounting to less than two-tenths of 1 per cent of the purchase price, it would probably not only be impracticable, but impossible, to compute this minuscule variation from OPA price levels to each customer. At any rate the taxpayer evidently convinced the OPA representative of the utter lack of feasibility of making these computations and at the taxpayer's suggestion the OPA agreed that the taxpayer, to remove from itself all possible breath of suspicion or criticism from its competitors, should give the money to the Government. The record discloses that the plan to give the money to the Government was "agreed upon by the parties." There was no contention that such gift was in satisfaction of any cause of action by the Government. Indeed the record clearly shows that the Government had no cause of action and, if it had, it would have lacked' the certainty of proof necessary to establish it in court. The stipulation of facts says:

Petitioner computed the selling price of its merchandise in accordance with the method prescribed by Maximum Price Regulation No. 127, making allowance for shrinkage in accordance with the actual figures specified in the finishers' contracts.

Surely, if the taxpayer complied with the regulations, any judge, or jury, if the question could ever get to a jury, would conclude that it had done all that the law could reasonably require of any citizen. Furthermore, since the taxpayer contended, and the Government agreed, that it would be "impracticable" to compute the overcharges so as to make the individual refunds, and since the action for penalty would necessarily be based upon the sales to each individual customer and not upon the composite overcharge for the entire year, it would certainly be far more "impracticable" for the Government to prove a case for a penalty in the event such an unthinkable action would be undertaken and in the face of the certainty of the proof that would be required of the Government for a recovery.

The fact that the letter from the taxpayer enclosing the check to the Government stated that the check was "in settlement of the Price

Administration's cause of action" does not thereby create a cause of action where none existed, nor does it present a claim from the Government where none had ever been presented and on the record none was in contemplation. All that can be drawn from this statement in the letter is that some overzealous lawyer or accountant was trying to cover all the possible numbers for his employer.

If the petitioner herein had made the rebates to its customers as suggested by the OPA, there would, of course, be no question as to the deductibility of these amounts as "allowance on sales." We can not agree with the majority that the same amount should not now be allowed under section 23 (q), I. R. C., as a gift to the Government. The majority opinion denies this deduction because it lacked "philanthropic motives," but came from the "desire of petitioner's president to absolve the petitioner from any stigma of price ceiling violations."

The Supreme Court of the United States, in *American Dental Co. v. Helvering*, 318 U. S. 322, held that the purpose of a gift was immaterial to its deductibility for income tax purposes as long as the distribution was in fact a gift.

The price control act was passed to prevent price inflation and unwarranted profits. The mistake by the taxpayer herein in its sales to dealers, who in turn sold to customers, was so microscopic in its amount that by the time the price for the wholesale account was divided up into retail sales to consumers it would take a superexpert mathematician to compute the infinitely small price increase. In fact, this taxpayer's mistake could not have affected the retail price. Furthermore, the taxpayer made no unwarranted profits, because it turned 100 per cent of those profits back to the Government.

We feel that for the Government now to tax petitioner for income, 100 per cent of which was delivered to the Government as soon as possible after its mistaken receipt was discovered, is nothing less than treating a mistake as a misdemeanor and penalizing efforts at good citizenship.

LEECH and KERN, *JJ.*, agree with this dissent.