WILLIAM F. DAVIS, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 22322. Promulgated September 28, 1951.

*Charles C. MacLean, Jr., Esq.*, and *Laurence F. Casey, Esq.*, for the petitioner.

*Joseph F. Rogers, Esq.*, for the respondent.

552

## OPINION.

Harron, *Judge:* The petitioner, who was an officer and director of United Drug, Inc., owned shares of stock in the corporation which he had purchased in 1938 and 1940. On October 25, 1945, and December 1, 1945, he sold 1,000 shares of this stock for $25,441.50, realizing a long term capital gain of $20,469.62. Less than 6 months after these sales, the petitioner purchased 1,000 shares of the company's stock under an option which had been granted to him and other executives of the corporation at an option price of $12.75 per share. Incidental expenses raised the total cost of the shares to $12,782.50. Because the purchase was made less than 6 months after the sale of the 1,000 shares previously held by the petitioner, the Securities and Exchange Commission determined that the petitioner had violated section 16 (b) of the Securities Exchange Act of 1934 [1] and that United Drug, Inc., was entitled to recover $12,659, which was the difference between the $12,782.50 paid by the petitioner for 1,000 shares and the $25,441.50 realized by him from the sale of 1,000 shares less than 6 months previously. The Securities and Exchange Commission thereupon notified the United Drug, Inc., that the Commission would not approve the corporation's annual proxy statement unless either the petitioner paid over $12,659 to United Drug, Inc., or it was disclosed in the company's annual proxy statement that the petitioner was indebted to United Drug, Inc., for $12,659, which was recoverable by the company or any holder of one of its equity securities suing in its behalf under section 16 (b) of the Securities Exchange Act of 1934. Thereafter, upon demand by United Drug, Inc., pursuant to section 16 (b), the petitioner paid to the corporation $12,659 on April 8, 1946. The petitioner now seeks to deduct this payment either as a business expense under section 23 (a) (1) of the Internal Revenue Code or as a loss under section 23 (e).

The respondent bases his determination that the payment is not a proper deduction under either section 23 (a) (1) or section 23 (e) primarily on the ground that the payment was a penalty imposed on

---

[1] 48 Stat. 896 (1934), 15 U. S. C., section 78 (p) (b) (1940).

the petitioner by section 16 (b) of the Securities Exchange Act of 1934 [2] and that to allow its deduction would frustrate the clear policy defined in section 16 (b). The petitioner, however, contends that the obligation imposed by section 16 (b) of the Securities Exchange Act of 1934 upon an officer or director of a corporation to pay over to his company the "insider's profits" realized from transactions within section 16 (b) is not a penalty, and that even if the payment of such an obligation is a penalty, the allowance of a deduction for its payment would not contravene the public policy expressed in section 16 (b).

Decision that the payment in question was in the nature of a penalty will not resolve the ultimate issue in this proceeding. The essential inquiry must be not only into the character of the payment made but also into the cognate question of whether the deduction of the payment in issue will frustrate any sharply defined public policy expressed in section 16 (b) of the Securities Exchange Act and subvert the purposes of that statute. As was said in *National Brass Works, Inc.* v. *Commissioner*, 182 F. 2d 526:

The real reason for denying the deductibility of "penalties" is not that they are characterized as such but because allowance in many cases would be against

---

[2] SEC. 16. (a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered on a national securities exchange, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security or within ten days after he becomes such beneficial owner, director, or officer, a statement with the exchange (and a duplicate original thereof with the Commission) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been any change in such ownership during such month, shall file with the exchange a statement (and a duplicate original thereof with the Commission) indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month.

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. *Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer*, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt *as not comprehended* within the purpose of this subsection.

See, also, the similar provisions contained in section 17 of the Public Utility Holding Company Act of 1935, 49 Stat. 832 (1935, 15 U. S. C. section 79 (q) (b) (1946), and section 30 (f) of the Investment Company Banking Act of 1940, 54 Stat. 837 (1940), 15 U. S. C. section 80 (a)–29b (1946). Up to June 30, 1949, 309,494 reports had been filed by 45,179 insiders of 2,733 issuers of publicly listed equity securities, 255 registered public utility holding companies, and 234 registered closed-end investment companies. 15 Ann. Rep. S, E. C. 47 (1949).

public policy. As the Supreme Court stated in *Commissioner* v. *Heininger*, 320 U. S. 467, 473 (1943), a tax deduction must not "frustrate * * * [any] sharply defined * * * policies" of the sovereign. It is true that neither the tax statute nor the treasury regulations condition deductibility upon the lawful character, either directly or remotely, of the expenditure made, * * * But, in the nature of things, public policy must narrow the field of allowable deductions which rest as they do upon legislative indulgence.

See also, *Rossman Corp.* v. *Commissioner*, 175 F. 2d 711, reversing 10 T. C. 468; *Farmers Creamery Co. of Fredericksburg, Va.*, 14 T. C. 879.

Based upon our examination of the extent and nature of the liability imposed by section 16 (b) and the application of that section to the petitioner's transactions, we have concluded that the obligation imposed by the section is in the nature of a penalty and that allowance of its deduction under the circumstances of this proceeding would frustrate the public policy expressed in the section. The Securities Exchange Act of 1934 is a comprehensive statute whose prime objective was the establishment and maintenance of a free and open market for trading in securities in which the prices obtained would represent an evaluation of worth based upon a full knowledge by all traders of the pertinent and available data. Securities Exchange Act of 1934, section 2, 48 Stat. 881 (1934), 15 U. S. C., section 78 (b) (1946). Because corporate directors, officers, and substantial stockholders, by reason of their inside position, have access to information not available to the market generally and, by reason of their managerial control, are able to influence the destinies of their companies in order to profit from market activities, section 16 (b) was devised to deprive such insiders of an incentive to take advantage of their corporate positions by removing the profit from all short-swing speculations by corporate directors, officers, or substantial stockholders. Report of the Senate Committee on Banking and Currency, S. Rept. No. 1455, 73d Cong., 2d Sess., p. 55 (1934); *Smolowe* v. *Delendo*, 136 F. 2d 231; *Benisch* v. *Cameron*, 81 F. Supp. 882; *Grossman* v. *Young*, 70 F. Supp. 970. Section 16 (b) provides that any profits realized by corporate insiders from "any purchase and sale, or any sale and purchase, of any equity security [of their own corporation] within any period of less than 6 months, shall inure to and be recoverable by" the corporation. The purpose of the section was to be "thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty." *Smolowe* v. *Delendo, supra.*

Although "the words 'penal' and 'penalty' have many different shades of meaning, and are in fact among the most elastic terms known to law," *Ward* v. *Rice*, 29 F. Supp. 714, 715, in *Rossman Corp.* v. *Commissioner, supra*, the Court of Appeals for the Second Circuit examined the functional nature of a penalty and determined that:

Taken in its broadest sense that word [penalty] has a punitive, as opposed to a remedial, meaning; it covers fines and other exactions which are not restitution for a wrong, and are only justified as a deterrent, or in order to satisfy an atavistic craving for retaliation.

See also, *Huntington* v. *Attrill*, 146 U. S. 657; *Atchison, Topeka & Santa Fe Ry.* v. *Nichols*, 264 U. S. 348; Restatement, Conflict of Laws, section 611. The payment made by the petitioner to United Drug, Inc., under section 16 (b) was not a restitution of a profit which properly belonged to the corporation, nor was the cause of action granted by the section a remedy predicated upon specific injury to a stockholder; rather, the cause of action was created to police insider activity, and the payment was imposed as a deterrent to action in violation of the statute. Because of the great difficulty of proving a conscious misuse of inside information by officers, directors, or substantial holders of securities in short-swing sales and purchases with a resulting profit, section 16 (b) imposes on these parties as a prophylactic measure absolute liability for the profit resulting from the short-swing transactions. The profit realized is forfeited to the corporation, not restored to a stockholder who may have been injured. The statutory accountability to the corporation imposed by section 16 (b), however, does not supersede any common-law liability to the person from whom the securities were bought or to whom they were sold. Securities Exchange Act of 1934, section 28 (a), 48 Stat. 903 (1934), 15 U. S. C. section 78 (bb) (1946). A stockholder aggrieved by a fraudulent misrepresentation or failure to disclose inside information may still sue the insider to recover either the shares sold or his damages from the transaction, despite the fact that the corporation is entitled to a separate recovery under section 16 (b). *Strong* v. *Repide*, 213 U. S. 419; cf. Ballantine, Law of Corporations, 217 (rev. ed. 1946).

The liability imposed by section 16 (b) springs from an act in violation of statute and is arbitrarily exacted for the violation. Unlike the situation under the O. P. A. regulations in the *Rossman* case *supra*, good faith, innocent transgression, or fair dealing neither excuse nor abate the statutory exaction,[3] which does not compensate for a financial loss suffered by the corporation but instead seeks to regulate human behavior through the threat of financial retribution. And the payment does not lose its character as a penalty because it is recoverable in a civil action, *United States* v. *La Franca*, 282 U. S. 568, 572–4; *United States* v. *Chouteau*, 102 U. S. 603, 611; or because in the exercise of its discretion the legislature has provided that it is to be paid to an individual rather than to the sovereign. *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Co-op. Marketing Assn.*, 276 U. S. 71, 97; *St. Louis I. M. & S. R. Co.* v. *Williams*, 251 U. S. 63.

[3] *Smolowe* v. *Delendo, supra,* at 237; *Truncale* v. *Blumberg,* 80 F. Supp. 387; see *Securities & Exchange Commission* v. *Chenery,* 318 U. S. 80.

The petitioner has referred us to the Report of the Securities and Exchange Commission on Proposal for Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934, dated August 7, 1941, page 36, in which, in opposing a proposal to repeal section 16 (b), the Commission said:

> The consequences of failing to comply with this standard [section 16 (b)] are not penal. The section does not make insiders' trading unlawful; it does not even subject insiders to injunctive proceedings.

However, we are no more swayed by the characterization made under the conditions of that report than we are by the use of the word "penalty" in reference to a section 16 (b) payment in *Smolowe* v. *Delendo*, *supra*. Although the sanction imposed by section 16 (b) may not be "penal" in the sense of "criminal," it still falls within the functional definition of "penalty" contained in the *Rossman* case and other cases cited *supra*, with their emphasis on the preventive as opposed to the remedial consequences of such payments.

It is not within the province of the Tax Court to remove any part of the naturally resulting punitive force from penalties imposed for acts contrary to public policy. Congress considered transactions in violation of section 16 (b) to be detrimental to the public welfare and designated a money sanction equivalent to the profit realized from the proscribed short-swing transactions as a substantial deterrent to such activities. The activities of the petitioner fell within the proscription of the statute;[4] and after the Securities and Exchange Commission, which is concerned with the practical enforcement of section 16 (b) and is in the best position to determine how important a particular sanction may be, refused to exempt the petitioner's activities from its operation, he paid the penalty therefor. Allowance of the deduction in question would weaken an effective method of enforcing the sharply defined policy expressed in section 16 (b) by mitigating the deterrent effect of the sanction imposed and making the net effect of the transactions profitable through the gaining of a tax advantage.

Cases such as *William Zeigler, Jr.*, 5 T. C. 150; *Robert S. Farrell*, 44 B. T. A. 238; and *Charles R. Stuart*, 38 B. T. A. 1147, which were

---

[4] *Park & Tilford* v. *Schulte*, 160 F. 2d 984, certiorari denied 332 U. S. 761; see H. Rept. No. 1383, 73d Cong., 2d Sess., pp. 10–11 (1934); S. Rept. No. 1455, 73d Cong., 2d Sess., pp. 55–63 (1934).

The petitioner has brought to our attention the fact that the Securities and Exchange Commission, in the exercise of its rule-making power, on May 12, 1949, exempted from the stricture of section 16 (b) transactions involving the purchase of an equity security by a director or an officer where the security is acquired directly from the issuer or its subsidiaries solely *in consideration of the services as an officer or employee* and pursuant to a bonus, profit-sharing, or other similar plan approved by the security holders in which the amount of securities distributed or set aside for a fiscal year pursuant to the plan is related to the net profits of the issuer and its subsidiaries for such year. Rule X–16B–3, 17 Code Fed. Reg. section 240.16b–3. Even if this regulation had been in effect in 1945, however, the transactions of the petitioner would not have been exempted from the proscription of section 16 (b) since they obviously would not have met the strict requirements of the regulation.

cited by the petitioner, are readily distinguishable. The element common to all of those cases, but which is lacking in this proceeding, is that in each case the payment was made as restitution to make an injured party whole, rather than as the result of a sanction imposed to effectuate the design of a statute. Because of the different nature of the payments in those cases, the question of whether or not their deduction would frustrate public policy as defined by a statute of the sovereign was not involved. In *Commissioner* v. *Longhorn Portland Cement Co.*, 148 F. 2d 276, reversing in part 3 T. C. 310, certiorari denied 326 U. S. 728, which held that a compromise payment in settlement of a violation of a state anti-trust law was not deductible, the Court said:

The sense of the rule that statutory penalties are not deductible from gross income is that the penalty is a punishment inflicted by the state upon those who commit acts violative of the fixed public policy of the sovereign, wherefore to permit the violator to gain a tax advantage through deducting the amount of the penalty as a business expense, and thus to mitigate the degree of his punishment, would frustrate the purpose and effectiveness of that public policy.

See also, *Universal Atlas Cement Co.*, 9 T. C. 971, affd. per curiam, 171 F. 2d 294, certiorari denied 336 U. S. 962; *Davenshire, Inc.*, 12 T. C. 958; *Helvering* v. *Superior Wines & Liquors, Inc.*, 134 F. 2d 373.

The importance of effectively enforcing a regulation which was passed for the general welfare requires neither the lessening of the deterrent effect of the penalty imposed nor the granting of a tax advantage through the allowance of a deduction for the payment made. It is held that the respondent was correct in refusing to allow the deduction in question.

Reviewed by the Court.

*Decision will be entered for the respondent.*

DISNEY and RAUM, *JJ.*, concur in the result.

---

MURDOCK, *J.*, dissenting: The petitioner sold some stock in 1945 which had a basis to him of $4,971.88. He received $25,441.50 from the purchaser. However, he was required by law as a result of that transaction, together with a subsequent purchase of additional shares on December 31, 1945, to pay $12,659 to United Drug, Inc. He actually paid that amount on April 8, 1946. It was then not too late to file an amended return for 1945. The two transactions were inseparable for tax purposes. The amount which he had to pay to the company reduced for tax purposes the amount realized from the sale so that the net result of his transaction was a long term capital gain during 1945 of $7,810.62. If the payment to the company required by law had been made in 1945 when the obligation arose, a proper re-

port for that year would have been a long term capital gain of $7,810.62.

It is taken for granted in the majority opinion that the petitioner, by making the payment to the company in 1946, in that year had a deductible business expense, a loss incurred in trade or business within section 23 (e) (1) or a loss sustained in a transaction entered into for profit within section 23 (e) (2). The evidence does not show that the payment was an ordinary and necessary expense of any business carried on by the petitioner, was connected with any trade or business carried on by him, or was connected with any transaction entered into for profit other than the sale of the securities. Since the sale of securities, even after the payment to the company, still resulted in a gain, it is difficult to see how section 23 (e) would apply. Thus, if the repayment is to be considered a separate transaction, it is not apparent that any provision of the Code provides for its deduction, and the only way it could be deducted would be to consider it a part of the 1945 sale from which the net result in 1945 was a long term capital gain of ʻ7,810.62 since $12,659 of the amount received from the purchaser did not belong to the petitioner but within the year was payable to United Drug, Inc.

The tax result should not be different or more favorable to the taxpayer merely because the petitioner delayed making the required payment to the company. The delay would not make the payment a loss where previously it had been merely a reduction of the amount realized as a profit in a sale. However, if the payment had some tax significance in 1946, it would have to be upon the theory that an excessive long term gain had been reported for 1945 and a balancing of accounts with the Commissioner would require an offsetting capital loss for 1946. But whatever the proper treatment under the Internal Revenue Code may be, it is not in violation of public policy under the facts of this case.

VAN FOSSAN, *J.*, agrees with his dissent.

---

TIETJENS, *J.*, dissenting: I respectfully record my dissent. Inherent in the majority opinion is recognition that petitioner suffered a loss within the provisions of the Internal Revenue Code providing for deductibility of losses. With this I agree. However, the majority denies petitioner the deduction of this loss on the ground that to do so would "frustrate" a well defined public policy. With this I disagree.

The majority seems to feel that to allow petitioner the deduction would in some way encourage corporate officers to indulge in short-swing speculation in the stocks of their companies despite the fact

that the Securities Exchange Act would require any profits made from such transactions to be paid over by the officer to the corporation. I find nothing in the record to justify this fear. It is always "possible" that deductions will result in some advantage to a taxpayer. But that result flows from the very nature of deductions. Suffice it to say that there is nothing here to show that petitioner had any such motive in buying and selling stock. It is apparent that his liability to the corporation came as a surprise to him. He had reported as income and paid the required tax on the profits from his sale. That his subsequent purchase subjected him to the sanction of parting with a portion of the gain he had realized, so far as I can see, was unrelated to the fact that the Code might provide for deductibility of his loss or the possibility that the taxing authorities might deny him that deduction. To deny him the deduction, as the majority has done, seems to me to subject petitioner to a double sanction nowhere provided for, either by the Securities Exchange Act or the Internal Revenue Code. He paid the tax required on his profit. Part of the profit was later taken from him and turned over to the corporation. Why deny him the deduction?

Of course, as the majority says, the sanction imposed by the Securities Exchange Act of 1934 was designed as a deterrent to police insider stock dealing. But in concluding that this Court must add a further deterrent, if it be a deterrent (and I cannot find that it would be) to such transactions, I think the majority is wrong.

The Exchange Act provides its own sanctions. If those sanctions are not harsh enough, Congress can remedy the situation. It has done so in similar situations. See *Weather-Seal Manufacturing Co.*, 16 T. C. 1312. Too, I think the majority passes too lightly over the pronouncement of the Securities and Exchange Commission itself to the effect that failures to comply with the section of the Securities Exchange Act here involved are not "penal" or "unlawful" and do not even "subject insiders to injunctive proceedings." The pronouncement continues: "It [sec. 16 (b)] simply guards against the use of inside information since such information is not the personal property of the insiders themselves and since any profits resulting from its use belong to the insiders no more than does the information itself." The majority is not "swayed by this characterization." I would accord it more weight. Neither can I disregard the subsequent actions of the Commission in ameliorating the effect of section 16 (b) so far as purchases by corporate officers of equities in their corporation or its subsidiaries pursuant to stock options, bonus plans, etc., are concerned. 17 C. F. R., section 240.16b–3. While the applicability of these actions is not too clear in the case at hand, the amendments made by the Commission indicate to me that the policy of the Securities

Exchange Act with reference to transactions of the kind here involved is not as well defined as the prevailing opinion argues.

In my opinion, to allow this petitioner to deduct for tax purposes the amount he was required to pay over to the corporation will in no way interfere with the policy of the Securities Exchange Act of 1934. The exaction of that statute is more remedial than penal in providing that the profits of the transaction inure to the corporation rather than to the individual, and the payment made should have been allowed as a deduction.

ARUNDELL, VAN FOSSAN, BLACK, and JOHNSON, *JJ.*, agree with this dissent.