ROBERT LEHMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

RUTH OWEN REINER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49736, 50103. Filed December 22, 1955.

*Isidor Sack, Esq.*, for the petitioner in Docket No. 49736.
*Sidney G. Kingsley, Esq.*, for the petitioner in Docket No. 50103.
*Ellyne E. Strickland, Esq.*, for the respondent.

### OPINION.

RICE, *Judge:* These consolidated proceedings involve deficiencies in income tax determined against petitioners for the year 1945, as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 49736 | Robert Lehman | $31,917.04 |
| 50103 | Ruth Owen Reiner | 593.12 |

The issues to be decided are: (1) Whether the gains realized by petitioners on the assignment of certain whiskey purchase agreements constitute ordinary income or long-term capital gains; and (2) whether petitioner, Robert Lehman, is entitled to a deduction for the so-called insiders' profit which, pursuant to section 16 (b) of the Securities Exchange Act of 1934, he paid in 1945 to a corporation of which he was a director.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

Robert Lehman (hereinafter sometimes referred to as Lehman) maintains his principal office in New York, New York. He filed an individual income tax return for the year 1945, on the cash basis, with the collector of internal revenue for the second district of New York.

Ruth Owen Reiner resides in New York, New York. She was married to Robert Lehman during 1945, and filed her individual income

tax return for that year, under her then name, Ruth Owen Lehman, with the collector of internal revenue for the second district of New York.

Lehman is an investor in securities and a member of Lehman Brothers, a firm engaged in the investment banking business. He is not and never has been a dealer in whiskey. Ruth Owen Reiner was not engaged in any trade or business during 1945, and her investments were made under the personal supervision and direction of her then husband, Robert Lehman.

Between December 10, 1943, and March 28, 1944, Lehman purchased 2,000 shares of the common stock of Park & Tilford, Inc., at an aggregate cost of $148,118.77. Ruth Owen Reiner purchased 200 shares of said stock on March 28, 1944.

On May 26, 1944, Park & Tilford Import Corporation (hereinafter called the Import Corporation) and then a wholly owned subsidiary of Park & Tilford, Inc., announced that it would offer to the stockholders of Park & Tilford, Inc., of record on June 23, 1944, whiskey purchase option-warrants (hereinafter referred to as warrants) entitling the recipients to purchase 6 cases of whiskey for each share of Park & Tilford, Inc., stock owned by them on the record date. On that same day, the board of directors of Park & Tilford, Inc., held a special meeting at which it was resolved to approve the offer to be made to its stockholders by its subsidiary, the Import Corporation. The officers of Park & Tilford, Inc., were directed to do and perform any and all acts necessary to carry out the undertaking.

In order to purchase whiskey pursuant to said warrants, the stockholders of Park & Tilford, Inc., were required to enter into whiskey purchase agreements with the Import Corporation. The stockholders were supplied with forms which enabled them to execute one or more whiskey purchase agreements for all or part of the whiskey to which they were entitled under their warrants. Although the warrants themselves were nonassignable, a notice of assignment was printed on the reverse side of each whiskey purchase agreement form, thus permitting a stockholder to enter into one or more whiskey purchase agreements and then to sell by assignment all or part of the whiskey which he had contracted to purchase from the Import Corporation. In such event, delivery of the assigned whiskey was to be made directly to the assignee. Notwithstanding any such assignment, however, the stockholder remained liable for amounts due under the whiskey purchase agreements.

The price which the stockholders of Park & Tilford, Inc., were required to pay for the whiskey under such warrants was the maximum price at which the Import Corporation was then allowed to sell such whiskey under the rules of the United States Office of Price Adminis-

tration (hereinafter referred to as the O. P. A.). It was the same price at which the Import Corporation could sell the whiskey to licensed wholesale whiskey dealers. On May 30, 1944, the O. P. A. established ceiling prices for the resale of whiskey which stockholders of Park & Tilford, Inc., might purchase from the Import Corporation. It fixed the amount of $3.46 per case as the ceiling price which stockholders might charge for the assignment of their whiskey purchase agreements. The assignee of the whiskey purchase agreement would, in addition, pay the purchase price of the whiskey itself, generally paying this amount directly to the Import Corporation. O. P. A. regulations required stockholders who sold whiskey purchase agreements to absorb their expenses for special licenses, permits, etc.

On June 30, 1944, Lehman received from the Import Corporation warrants entitled him to enter into whiskey purchase agreements to buy 12,000 cases of whiskey. He exercised his warrants on August 18, 1944, and executed a whiskey purchase agreement to buy all the whiskey he was entitled to. Ruth Owen Reiner received her warrants on or about July 5, 1944, entitling her to buy 1,200 cases of whiskey. She exercised them and executed a whiskey purchase agreement for such 1,200 cases on August 25, 1944.

During the period February 23, 1945, through March 10, 1945, Lehman sold his whiskey purchase agreements to 11 retail liquor dealers at the O. P. A. ceiling price of $3.46 per case and received the aggregate amount of $41,520. Ruth Owen Reiner made similar sales of her whiskey purchase agreements on February 26, 1945, at the O. P. A. ceiling price of $3.46 per case, and received the sum of $4,152. Petitioners reported the gross amounts received as long-term capital gains on their 1945 income tax returns, without any deductions for basis. Each of them had held the whiskey purchase agreements for more than 6 months. Respondent determined that such gains constituted ordinary income.

At all times relevant hereto, Park & Tilford, Inc., was a holding company and had no licenses permitting it to sell alcoholic beverages. On June 23, 1944, when the whiskey purchase offer became effective, and throughout the years 1944 and 1945, Park & Tilford, Inc., had 258,613 shares of common stock outstanding. The stockholders and/or their assignees purchased 661,653 cases of whiskey, representing the exercise of warrants issued to stockholders of 110,275 shares. At $3.46 per case, this offer, if accepted by all the stockholders, had a theoretical gross value of $5,368,805.88, less license taxes, expenses of sale, etc. Park & Tilford, Inc., had accumulated earnings of $44,562.57 on December 31, 1944, and $37,387.16 on December 31, 1945. The Import Corporation had accumulated earnings of $3,514,330.09 on December 31, 1944, and $4,507,836.36 on December 31, 1945.

In 1943, Lehman owned stock of Pan American Airways Corporation (hereinafter called Pan American) which he had acquired some 10 years earlier. He was also a member of the board of directors of that corporation and remained in that position at all times relevant hereto. In June 1943, he sold 600 of his shares in Pan American for $20,696.62 and reported the profit on such sales as a capital gain on his return for that year.

On November 26, 1943, Lehman donated 1,013 shares of his Pan American stock to various charities. In order to replace these shares, he bought 1,013 shares of Pan American stock on the same date. Six hundred of the shares purchased on November 26, 1943, cost him $18,032.29. As this purchase on November 26, 1943, was within 6 months of the sales of 600 shares made during the month of June 1943, the difference between the sales proceeds of $20,696.62 and the cost of $18,032.29 for 600 shares, namely, $2,664.33, was a profit which, pursuant to section 16 (b) of the Securities Exchange Act of 1934, inured to Pan American. On June 20, 1945, Lehman paid this amount of $2,664.33 to Pan American and claimed it as a deduction of his 1945 tax return. The respondent disallowed this deduction.

The first issue which we must decide is whether petitioners are required to report the profits from the sale of their whiskey purchase agreements as ordinary income or as capital gains. Respondent contends that the purpose of the plan pursuant to which the stockholders of Park & Tilford, Inc., were granted options to purchase liquor from its wholly owned subsidiary, the Import Corporation, was to circumvent the normal sequence whereby the profit on such liquor would be earned by the subsidiary, distributed to the parent company, and then, distributed to the stockholders of the parent company as dividends. Respondent argues that this transaction constitutes an anticipatory assignment of income by the parent company and that the profits realized by its stockholders are, in effect, dividends taxable to them as ordinary income.

We can see no basis, however, for viewing the instant transaction as an anticipatory assignment of income. The anticipatory assignment of income doctrine presupposes the ability of the assignor to earn the income at issue and an intent to escape the tax burden thereon by transferring the right to such income prior to its actual receipt. Here, however, the Import Corporation charged the stockholders of its parent company the maximum price it could lawfully obtain. During 1944, whiskey was in short supply and it appears that the Import Corporation would have experienced little difficulty in selling the whiskey here involved. It mattered little to whom it sold whiskey during that year, since its maximum selling price was fixed by O. P. A. regulations. Therefore, it decided to favor the stockholders of its parent corpora-

tion by offering them options to purchase 6 cases of whiskey for every share of Park & Tilford, Inc., stock which they owned. The offer was not assignable and stockholders owning over half of the Park & Tilford, Inc., stock took no part in the plan. Those who did were required to enter into purchase agreements with the Import Corporation; and, if they did not care to retain the whiskey for their personal use, they were permitted to sell such purchase agreements at the O. P. A. fixed price of $3.46 per case. Petitioners, as stockholders of the parent company, entered into such purchase agreements with the Import Corporation for the future delivery of 13,200 cases of whiskey. After holding these purchase agreements for somewhat over 6 months, they assigned their rights thereunder to retail liquor dealers at the O. P. A. price of $3.46 per case and reported the total amount received as capital gains. Clearly, there was no assignment of income here since the Import Corporation realized every bit of profit it was legally permitted to. It was unable legally to sell its inventory at its appreciated value and transfer profits which might be realized in this manner to its parent corporation.

It is true that petitioners, and the other stockholders of Park & Tilford, Inc., who exercised their whiskey options, made a bargain purchase. They purchased an extremely scarce commodity at its wholesale price. But this bargain purchase is not the same type of bargain as that found in *Eastern Carbon Black Co.* v. *Brast*, 104 F. 2d 460 (C. A. 4, 1939), upon which respondent relies. In that case, corporate assets were sold to the stockholders at prices less than the corporation could have obtained for such assets in the open market. In the instant case, the Import Corporation charged every penny it was legally permitted to; there was no intent to shift potential earnings of the corporation to its stockholders. As for *Commissioner* v. *First State Bank*, 168 F. 2d 1004 (C. A. 5, 1948), certiorari denied 335 U. S. 867 (1948); and *Rudco Oil & Gas Co.* v. *United States*, 113 Ct. Cl. 206, 82 F. Supp. 746 (1949), which are also cited by respondent, these cases involve the anticipatory assignment of income which would have been earned by the corporations in the normal course of their business except for such assignments. But here, the corporation was not permitted to earn the amounts involved. The bargain nature of the transaction arises out of the fact that the purchasers were, because of price-fixing regulations in effect at that time, able to immediately resell the whiskey at a higher price. Although a real economic benefit was conferred upon the stockholders of Park & Tilford, Inc., a benefit similar in nature was conferred upon the regular customers of the Import Corporation to whom it sold whiskey at the same price. Not every such benefit conferred upon a stockholder is to be regarded as resulting in the distribution of a dividend. The Supreme Court, in

*Palmer* v. *Commissioner*, 302 U. S. 63, 69 (1937), has stated the rule as follows:

While a sale of corporate assets to stockholders is, in a literal sense, a distribution of its property, such a transaction does not necessarily fall within the statutory definition of a dividend. For a sale to stockholders may not result in any diminution of its net worth and in that case cannot result in any distribution of its profits.

The whiskey purchase agreements which petitioners entered into were capital assets in their hands. Petitioners were not engaged in the business of selling whiskey, but acquired these contract rights as an incident of one of their investments. Having held them for over 6 months, they are entitled to treat the profits realized on their sale as long-term capital gains. See *Greenbros, Inc.*, 23 T. C. 226 (1954); *Thomas E. Wood*, 16 T. C. 213 (1951).

The second issue herein involves the question of whether petitioner is entitled to deduct the so-called insiders' profit which, pursuant to section 16 (b) of the Securities Exchange Act of 1934, he paid in 1945 to a corporation of which he was a director. This issue was extensively discussed in *William F. Davis, Jr.*, 17 T. C. 549 (1951), and a holding reached adverse to the petitioner. That case is dispositive of this issue and we hold that no deduction is allowable to petitioner with respect to such payment.

*Decisions will be entered under Rule 50.*