**Nathan and Joanne T. CUMMINGS, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 54, Docket 74–1406.

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1974.

Decided Oct. 31, 1974.

Certiorari Denied April 14, 1975. See 95 S.Ct. 1571.

Louis A. Bradbury, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Scott P. Crampton and Meyer Rothwacks, Washington, D.C., on the brief), for appellant.

Glen H. Kanwit, Chicago, Ill. (Hopkins, Sutter, Owen, Mulroy & Davis, Chicago, Ill.), for appellees.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The interplay of two distinct statutory schemes often gives rise to some engrossing legal questions. In this case, we are called upon to consider the relationship of the Internal Revenue Code and the securities laws—in particular, the proper tax treatment of a payment made in satisfaction of an apparent liability under § 16(b) of the Securities Exchange Act.[1] We find that the policies of both statutes support the determination of the Commissioner of Internal Revenue that § 16(b) repayments should be treated as long term capital losses, and reverse the decision of the Tax Court allowing a deduction as an ordinary and necessary business expense.

I.

Unlike those in many tax cases, the facts here are relatively straightforward. Nathan Cummings, chairman of the board and chief executive officer of Consolidated Food Corporation, was offered a large bloc of stock in Metro-

[1]. In pertinent part, Section 16(b) provides:
For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was ac- quired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *. 15 U.S.C. § 78p (b) (1970).

Goldwyn-Mayer, Inc. [MGM] during 1959. He was told that the company was experiencing management problems, and that if he would become a director, three members of the board who were involved in controversy would resign. Cummings then purchased 51,500 shares of MGM stock for something more than $1,030,000, and was elected to the board after the three directors resigned.

The price of MGM stock rose, and on April 17, 1961, Cummings sold 3400 shares for a total of $227,648.28. His profit was properly reported as a long term capital gain on the 1961 tax return which he and his wife jointly filed. Between September 18 and October 2, 1961, however, Cummings bought back 3000 shares for $146,960.89. This purchase, within six months after the sale, brought him within the likely purview of § 16(b) of the Securities Exchange Act, making the difference between the sale price and the purchase price, $53,870.81, recoverable by MGM. Cummings was apparently unaware of his liability until soon after MGM, in preparation for its 1962 annual meeting, submitted its proxy material to the Securities and Exchange Commission. On January 16, 1962, the Division of Corporate Finance of the SEC informed Joseph A. Macchia, secretary of MGM, that if Cummings had realized profits from his sale and purchase, that fact would have to be noted in the proxy statement.[2] Macchia promptly communicated this to Cummings and although Cummings believed that any violation, if it did occur, was inadvertent, he nevertheless decided to remit the $53,870.81 to MGM. Cummings testified that the purpose of the payment was to prevent any delay in the issuance of MGM's proxy statement and also to protect his business reputation, which might be injured by a disclosure of his potential liability because of an alleged securities laws violation. The Tax Court gave credence to Cummings's version. In any event, MGM issued its proxy statement dated January 18, 1962, without reference to any potential liability outstanding from Cummings.[3]

Cummings and his wife treated his repayment as a deduction against ordinary income on their 1962 income tax return, but the Commissioner disallowed this and assessed a deficiency of $45,790.18, maintaining that long term capital loss treatment was appropriate.[4] The Tax Court, 60 T.C. 91 (1973) held that the payment was properly characterized as an ordinary and necessary business expense, incurred to protect Cummings's business reputation. After the Court of Appeals for the 7th Circuit reversed a similar Tax Court decision, James E. Anderson, 480 F.2d 1304 (7th Cir. 1973), rev'g, 56 T.C. 1370 (1971), the Tax Court reconsidered the case. It affirmed its previous holding, although six judges dissented and one abstained.[5]

## II.

We are not required in this case to write on a *tabula rasa*, for the Courts of Appeals of two circuits have already rejected the Tax Court's treatment of § 16(b) repayments as ordinary and necessary business expenses. Anderson v. C.I.R., 480 F.2d 1304 (7th Cir. 1973), rev'g, 56 T.C. 1370 (1971); Mitchell v. C.I.R., 428 F.2d 259 (6th Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 868,

2. *See* 17 C.F.R. § 240–14a–101, Item 7(e), Instruction 4 (1974).

3. On February 1, 1962, Cummings learned of a corporation which had not required repayment of § 16(b) profits by a director who had inadvertently violated the statute. Accordingly, on February 6, he wrote Macchia to request refund of his $53,870.81 payment. On advice of its independent counsel, MGM never made the refund.

4. Long term capital losses must first be charged against long term capital gains, Int.

Rev.Code of 1954 [Code] §§ 1201(b), 1222(5), and then charged against short term capital gains. They are deductible from ordinary income only to the extent of $1000 a year, Code § 1211(b), and may be carried over the five subsequent years. Code § 1212.

5. The Tax Court found an additional business purpose in Cummings's desire to prevent delay in the issuance of MGM's proxy statement.

27 L.Ed.2d 807 (1971), rev'g, 52 T.C. 170 (1969).[6] Our starting point, as was theirs, is Arrowsmith v. C.I.R., 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), which held that an expenditure made for a business purpose will not be treated as an ordinary and necessary business expense if it is sufficiently related to an earlier capital gains transaction. Since the Commissioner relies heavily on *Arrowsmith*, brief recitation of the facts of that case would aid in the resolution of the legal issue here presented. Two individuals liquidated a corporation which they owned, and paid taxes on their profits at the long term capital gains rate. After the lapse of four years, a judgment was entered against the liquidated corporation which the individuals, as transferees of the corporate assets, were then required to pay. The Supreme Court disallowed deduction of the payment as a business expense, because, the Court reasoned, had the liability been satisfied in the year the corporation was liquidated, the payment would have been applied to reduce the taxpayers' long term capital gain. The payment was thus to be treated as a long term capital loss when it was made four years later.

The *Arrowsmith* rule was explained and applied in United States v. Skelly Oil Co., 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed. 642 (1969). There, a corporation repaid money which it had recorded in an earlier taxable year as income reduced by the 27½% oil depletion allowance. The Court held that the corporation could not deduct 100% of the repayment as a business expense since only 72½% of the income had been subject to taxation. *Arrowsmith* was held to forbid the windfall which would result if income taxed at a special lower rate when received were deductible on repayment at a different and more favorable rate.

The nexus between the § 16(b) repayment and the earlier capital gains is apparent. The repayment "had its genesis" in the earlier sale, *see Mitchell*, 428 F.2d at 261, which was a prerequisite for § 16(b) liability. As the *Anderson* court noted, 480 F.2d at 1307, "The amount of liability is calculated by subtracting from the sales proceeds the lowest purchase price within the six-month period" so the repayment may properly be viewed as a return of a portion of the sales proceeds or as an adjustment of the sales price. In addition, the capital gain appears to include the profits from the sale and purchase. Cummings experienced a gain in the economic sense when he repurchased the stock at a lower price than that at which it was sold. But the only gain which he recognized for tax purposes was the capital gain on his original sale. Thus, for tax purposes, his payment of $53,870.81 profit from the sale and purchase may appropriately be regarded as an adjustment to the amount of that capital gain.

It is apparent, also, that Cummings would obtain a windfall like that condemned in *Skelly Oil* if we were to treat his § 16(b) repayment as an ordinary and necessary business expense. Both before and after the events at issue he owned the 3000 shares of MGM. In the interim, however, he consummated a sale which resulted in the recognition of a gain and a subsequent repurchase within six months—the combination of which violated § 16(b). The § 16(b) repayment was designed, so far as practicable, to restore the status quo prior to the offending sale and purchase. We would be remiss, therefore, if we allowed Cummings a windfall which would flow from permitting his gain to be taxed at a lower capital gains rate and his repayment—designed to erase the improper § 16(b) gains—to be deducted at the more favorable ordinary income rate.[7]

---

6. The appeal in Charles I. Brown, T.C.Mem. 1973–275, 32 CCH T.C.Mem. ¶ 32,258 (1973), a case similar to this one, is pending before the 10th Circuit. Laurence M. Marks, 27 T.C. 464 (1956), the first of the line of Tax Court decisions, was never appealed.

7. We are cognizant, of course, of Judge Campbell's dissenting opinion in *Anderson*, 480 F.2d at 1309. We believe that our discussion thus far responds to his view that only by improper resort to general equitable considerations, or a desire to bring about statutory symmetry, or the anxiety to imple-

The result we reach is supported not only by a proper interpretation of the tax laws, but by the policy of § 16(b) as well. Our longstanding interpretation of that provision, noted over 30 years ago, is that " . . . the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions" within its purview, Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S. Ct. 56, 88 L.Ed. 446 (1943) in order to remove the incentive for short-term trading by corporate insiders. It would defeat this policy if insiders could reap a tax advantage by enjoying the low capital gains rate on realized gains while obtaining a deduction against ordinary income when they surrendered those gains in satisfaction of a § 16(b) liability. In this case, for example, Cummings would benefit by $45,790.18 if he were permitted to deduct his repayment as a business expense,[8] although (assuming that he elected the 25% alternate capital gains tax) he paid taxes of only $13,467.70 when he reported the comparable gain in 1961. Thus, he seeks to profit by $32,322.48 as a result of his § 16(b) transaction. We agree with the Seventh Circuit that, "Without good reason, we are unwilling to interpret the Internal Revenue Code so as to allow this anomalous result which severely and directly frustrates the purpose of Section 16 (b)." Anderson, 480 F.2d at 1308, citing Skelly Oil, supra, and Tank Truck Rentals, Inc. v. C.I.R., 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958).

Cummings maintains, however, that the statutory policy is irrelevant to this proceeding because he was never adjudicated to be in violation of § 16(b). See 61 T.C. at 3. In particular, he notes two possible defenses—that the MGM board had the discretion not to demand repayment of Cummings's insider profits, and that the "opportunity for speculative abuse," described as the keystone of § 16(b) liability in Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), was lacking because the decision to repurchase was made by Cummings's personal financial assistant.

Even a fledgling securities lawyer would recognize that these "defenses" border on the frivolous. There is no evidence that MGM would not have demanded payment. Moreover, the failure of a board of directors to demand repayment of § 16(b) profits scarcely extinguishes an insider's liability, which may readily be collected in a shareholder derivative action that is inevitable when stock is as widely held as MGM's. Nor is Cummings's reliance on Kern County plausible. Suffice to say that that case involved an "unorthodox" transaction, see 411 U.S. at 593, 93 S.Ct. 1736, in which a company making a takeover bid was forced to exchange its stock when its target engineered a successful defensive merger, a situation hardly comparable to the garden variety sale and purchase which was executed by Cummings.

In any event, we need not conclusively determine that Cummings violated or intended to violate § 16(b) in order to deny him an ordinary and necessary business expense deduction. Section 16(b) is a placid inlet in the chaotic sea of securities law—a statute designed for easy application. The elements of the cause of action are simple, and information about possible violations is widely disseminated. Thus, no proof need be forthcoming that the insider intended at the time he sold to repurchase the securities within six months, or that inside information was actually used. 15 U.S. C. § 78p(b) (1970). To simplify enforcement, corporate insiders are re-

---

ment the enforcement of § 16(b), can one read the tax laws as not permitting § 16(b) repayments to be deductible as business expenses. In our view, the rationale of Arrowsmith condemns windfalls no less than does the appropriate interpretation of § 16(b).

8. Since Cummings already had large capital loss carryovers, the amount of the deficiency is equal to his full tax benefit.

quired to make periodic reports to the Commission of transactions in their company's stock. 15 U.S.C. § 78p(a) (1970). These reports, summarized monthly, are distributed by the Government Printing Office to about 11,500 subscribers, 39 S.E.C.Ann.Rep. 38 (1973) and seen by many more. Potential § 16(b) liabilities must be described in the company's annual proxy statement, 17 C.F.R. § 240.14a–101, Item 7.(e), Instruction 4 (1974). One can hardly imagine a scheme better designed to insure the almost automatic enforcement of a statute, and we decline to subvert it by refusing to squeeze all profits from inside transactions unless liability has been established by a court adjudication.[9]

### III.

In viewing Cummings's § 16(b) repayment as a long term capital loss rather than a business expense, we do not ignore a third alternative. As Judge Drennan suggested in his dissenting opinion in the Tax Court, the repayment may be viewed as linked to the repurchase, and treated for tax purposes as an addition to the basis of the purchased stock.[10] The effective net result is that the repayment would be treated as a long term capital loss in the year that the repurchased stock is finally sold.[11] It may be that such treatment would in an appropriate case better effectuate the policy of § 16(b) than that which we adopt today. But, by deferring the tax benefit of a payment currently made, the addition to basis would exact a penalty beyond that specified by Congress from an insider whose violation might be only inadvertent.[12] Since neither party urges adoption of Judge Drennan's formula, however, we decline to resolve the issue.[13]

Reversed.

J. JOSEPH SMITH, Circuit Judge (concurring in the result):

I concur in the reversal of the judgment, but respectfully differ from the rationale adopted.

I do not agree that this case is controlled by Arrowsmith v. C.I.R., 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952) and United States v. Skelly Oil Co., 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed. 642 (1969). Both of those cases held that, when income is taxed at a reduced rate when received, it cannot be deducted at a more favorable rate if for some reason it has to be repaid. At the heart of those cases is the repayment of an amount which had previously been included in income. Indeed, in *Skelly Oil*, the Court was doing nothing more than applying a statute, 26 U.S.C. § 1341, which by its terms is limited to the repayment of an "item included in gross income in the year of receipt." 394 U.S. at 683, 89 S. Ct. at 1382.

This case, involving a probable sale and repurchase violation of § 16(b), simply does not present that kind of sit-

9. Nor are we persuaded by Cummings's contention that the statutory purpose is not undercut because favorable business expense treatment would be permitted only if an insider is able to establish a business purpose in making the payment. Virtually every insider who repays his § 16(b) profits will convincingly claim that he did so to protect his business reputation.

10. A similar result was urged in Lokken, Tax Significance of Payments in Satisfaction of Liabilities Arising Under Section 16(b) of the Securities Exchange Act of 1934, 4 Ga. L.Rev. 298 (1970).

11. If the stock is sold at a loss, the increase in basis would increase the amount of that capital loss. If the stock is sold at a gain, the increase in basis would reduce that gain —the effective equivalent of a capital loss.

12. Indeed, similar considerations were the apparent rationale for Laurence M. Marks, 27 T.C. 464 (1956), which departed from the earlier Tax Court rule that § 16(b) repayments would be denied any deduction. Robert Lehman, 25 T.C. 629 (1955); William F. Davis, Jr., 17 T.C. 549 (1951).

13. Nor need we decide whether Code § 1341 is available to provide relief to the taxpayer whose § 16(b) repayment and resulting long term capital loss occur in a year subsequent to that in which he recognized the capital gain. *See* Lokken, *supra* note 10, at 315–320.

uation. The mere fact that there could be no liability under § 16(b) were there not a sale which (in this case) resulted in taxable income is irrelevant, because the money paid out by Cummings to MGM cannot be treated as an item previously included in income. The amount of income on the sale (determined by the difference between the original purchase price and the sale price) has no bearing on the calculation of the insider's profit (determined, roughly, by the difference between the sale price and the repurchase price). In fact, it is perfectly clear that there can be an insider's profit even if the sale resulted in a loss, because the sale assumes relevance for tax purposes only when linked with the original purchase and the repurchase will not have tax significance until a subsequent sale occurs. The sale and repurchase, which result in § 16(b) liability, do not constitute a transaction with any tax significance whatever, and the insider's profit is not income for tax purposes, regardless of whether it may be considered, as my brother Kaufman considers it, as "gain in the economic sense." *Ante* at 451.

I also disagree with the characterization of the payment to MGM as an adjustment to the sale price of the stock. I cannot subscribe to the view that "the capital gain appears to include the profits from the sale and purchase," *ante* at 451, because the transaction resulting in capital gain terminated with the sale, and the purchase was the initiation of a new transaction that should be considered entirely separate and independent for tax purposes. In any event, transactions are to be treated as they actually occurred, not in accord with what might have occurred. C.I.R. v. National Alfalfa Dehydrating and Milling Co., 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974).

This reasoning applies, of course, only to sale and repurchase violations of § 16(b). The tax significance of a purchase and sale violation would be entirely different. In that case, the insider's profit obviously should be treated as the repayment of an amount included in income. But the fact that one kind of violation of § 16(b) leads to *Arrowsmith/Skelly Oil* treatment does not require that all kinds of violations of § 16(b) be so treated. The income tax provisions of the Internal Revenue Code are not to be construed *in pari materia* with the estate and gift tax provisions, Farid-es-Sultaneh v. Commissioner, 160 F.2d 812, 814–815 (2d Cir. 1947); there is no more reason why they must be construed *in pari materia* with the 1934 Securities and Exchange Act.

Nor do I think Tank Truck Rentals, Inc. v. C. I. R., 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958) relevant to the litigation before us. That decision—which is to be applied only in a "sharply limited and carefully defined category" of cases, Commissioner v. Tellier, 383 U.S. 687, 694, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966)—involved the payment of punitive fines assessed after an adjudication of liability. Since the payment here— made in contemplation of potential liability—was remedial and not punitive, Feder v. Martin Marietta Corp.; 406 F. 2d 260, 266 (2d Cir. 1969); Adler v. Klawans, 267 F.2d 840, 844 (2d Cir. 1959), this is not an appropriate case for applying a policy designed to avoid the dilution of punishment. *See Tellier, supra,* 383 U.S., at 694, 86 S.Ct. 1118.

For these reasons, I would not hold that the ordinary loss deduction should be disallowed and treated instead as a capital loss deduction. These transactions should more properly be treated in accordance with the opinion of Judge Drennen below: For tax purposes, the proper treatment would be to add to the repurchase price as the basis for the new shares the amount paid over, and to recognize neither capital gain or loss nor ordinary business expense until the tax year in which the shares are sold.