**William L. MITCHELL and Marian S. Mitchell, Petitioners-Appellees,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**No. 19950.**

United States Court of Appeals, Sixth Circuit.

June 18, 1970.

**260**

Stanley L. Ruby, Atty., Dept. of Justice, Washington, D. C., for respondent-appellant; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Loring W. Post, Attys., Dept. of Justice, Washington, D. C., on brief.

Harry S. Stark, Detroit, Mich., for petitioners-appellees; Morris, Stark, Rowland, Regan & Reagan, Detroit, Mich., on brief.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

The question presented on this appeal is whether a payment made by a taxpayer to his employer for an alleged "insider" profit in a stock transaction, which was in the nature of a business expense but which had its genesis in a transaction in which the taxpayer realized a long term capital gain, should be treated as a long term capital loss. Stated differently, the issue is whether the tax benefits doctrine of Arrowsmith v. Commissioner of Internal Revenue, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6, controls under the facts of the present case.

In an opinion published at 52 T.C. 170, the Tax Court decided the case in favor of the taxpayer. The Commissioner appeals. We reverse.

The taxpayer, William Mitchell,[1] is a vice president of General Motors Corporation (hereafter General Motors) in charge of styling. On October 5, 1962, he sold 2,736 shares of General Motors common stock, of which 2,130 shares brought $54.75 per share. After commissions and taxes he netted $115,535 on the sale of these shares. He reported the profit as a long-term capital gain on his 1962 income tax return.

On January 10, 1963, the taxpayer exercised a restricted stock option, which he had acquired in March 1959 under the General Motors stock option plan. He purchased 2,130 shares of General Motors common stock at the option price of $45.82 per share, a total of $97,596.60.

The Securities and Exchange Act of 1934, § 16(b), 15 U.S.C. § 78p[1] (1964 ed.), referred herein as § 16(b)[2] prohibits the buying and selling or selling and buying within a six months period of the stock of a corporation by an insider. If such a transaction occurs the corporation must either be paid the difference between the two prices of the stock or the corporation must show the amount on its annual report as a debt owed to the corporation.

The taxpayer was not aware of the provisions of § 16(b) at the time he en-

---

1. Mrs. Mitchell is a party to the action only because she filed a joint return with her husband.

2. Section 16(b) provides as follows:
   "(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchas-

ing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

tered into the sale and purchase of the stock here in question. He made the transactions upon the advice of a banker in the planning and organization of his estate.

General Motors learned of the transactions and advised the taxpayer that in the opinion of its General Counsel he had violated § 16(b). Demand was made for payment of $17,939.29, the difference between the selling price and the purchase price of the 2,130 shares which were both sold and purchased within less than six months.

The taxpayer was informed that if he did not make the payment the alleged § 16(b) violation would be shown in the General Motors proxy statement distributed annually to all General Motors stockholders. He concluded that such publication could hurt his relationship with General Motors. It also is likely that had he not paid it voluntarily he would have been sued by General Motors to recover the amount alleged to be due.

At no time has the taxpayer admitted that he violated § 16(b). No judicial or administrative determination as to his liability under § 16(b) has been made.

The taxpayer was advised by his attorney that there was a theory under which he might not be liable to General Motors under § 16(b) but that under all the circumstances he nevertheless should pay the requested amount. Pursuant to this advice taxpayer remitted $17,939.29 to General Motors in settlement of his alleged violation of § 16(b), but specifically did not admit his liability thereunder in so doing. He expressed his belief that he was not an "insider" within the meaning of the SEC rules and regulations.[3]

On his 1963 income tax return the taxpayer claimed an ordinary and necessary business expense deduction in the amount of $17,939.29, representing his payment to General Motors in satisfaction of his alleged liability under § 16(b). The Commissioner disallowed

the deduction and allowed the taxpayer only a long-term loss deduction.

The Tax Court held that the payment was deductible as a business expense, making the following ultimate finding of fact:

"Petitioner's payment of $17,939.29 to General Motors was made to avoid injury to his business reputation and disadvantage to his career, embarrassment to General Motors and himself, and the expense of possible future litigation."

Reference is made to the decision of the Tax Court for a more detailed recitation of the facts. 52 T.C. 170.

The Commissioner makes the following concession in his brief:

"The Commissioner does not now disagree that taxpayer made the payment in question because he believed failure to make the payment would damage his career at General Motors, and that under some circumstances the payment could be an ordinary deduction for a business expense. The Commissioner does contend, however, that this is not such a case and that the rule of Arrowsmith v. Commissioner [of Internal Revenue], 344 U.S. 6 [73 S.Ct. 71, 97 L.Ed. 6] (to the effect that an income tax deduction must be characterized by the income item in which it had its genesis and without which it would not have been paid) is governing here and takes precedence over the Code provision allowing ordinary business expense deductions."

This appeal presents a question of law and not of fact. The findings of fact of the Tax Court are not clearly erroneous and will be accepted as correct for purposes of disposing of the appeal. Rule 52(a), Fed.R.Civ.P.

■ In *Arrowsmith* the taxpayer received payments in 1937–40 in liquidation of a corporation jointly owned with another and reported the payments as

---

3. Section 240.3b–2 of the General Rules and Regulations, Securities Exchange Act of 1934 (17 C.F.R. § 240.3b–2).

capital gains. In 1944 a judgment was rendered against the corporation and one of the owners individually. Each paid one-half of the judgment and deducted the entire amount paid as an ordinary business loss. The Supreme Court held that the losses should be treated as capital losses even though occurring in a later year since they were an integral part of the corporate liquidation and not an ordinary loss.

The Tax Court held that the tax benefits doctrine of *Arrowsmith* does not apply under the facts of the present case. The decision of the Tax Court does not cite United States v. Skelly Oil Co., 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642, in which the Supreme Court applied the doctrine of *Arrowsmith*. The *Skelly Oil* opinion was announced on April 21, 1969, only nine days prior to the release of the decision of the Tax Court in this case. Presumably the decision of the Tax Court already was in the hands of the printer at the time the opinion in *Skelly Oil* was announced. Thus the Tax Court decided the present case without having the benefit of the latest pronouncement of the Supreme Court in applying the tax benefit doctrine of *Arrowsmith*. From our study of *Skelly Oil* this Court is convinced that if the Tax Court had considered *Skelly Oil* it would have applied the *Arrowsmith* doctrine in the present case and held that the amount paid by the taxpayer to General Motors must be treated as a capital loss deduction.

In *Skelly Oil* income was received which prior to being taxed was reduced by a 27½% oil depletion allowance. Subsequently the taxpayer had to refund part of this income. The taxpayer sought to deduct the full amount of the refund as an ordinary deduction. The Commissioner disallowed the deduction.

In holding against the taxpayer, the Supreme Court said:

"[T]he Code should not be interpreted to allow respondent 'the practical equivalent of double deduction,' Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 68, 54 S.Ct. 596, 598, 78 L.Ed.

1127 (1934), absent a clear declaration of intent by Congress. See United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054 (1927). Accordingly, to avoid that result in this case, the deduction allowable in the year of repayment must be reduced by the percentage depletion allowance which respondent claimed and the Commissioner allowed in the years of receipt as a result of the inclusion of the later-refunded items in respondent's 'gross income from the property' in those years. Any other approach would allow respondent a total of $1.27½ in deductions for every $1 refunded to its customers.

"Under the annual accounting system dictated by the Code, each year's tax must be definitely calculable at the end of the tax year. 'It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals.' Burnet v. Sanford & Brooks Co., *supra*, 282 U.S. [359] at 365, 51 S.Ct. [150] at 152, [75 L. Ed. 383]. In cases arising under the claim-of-right doctrine, this emphasis on the annual accounting period normally requires that the tax consequences of a receipt should not determine the size of the deduction allowable in the year of repayment. There is no requirement that the deduction save the taxpayer the exact amount of taxes he paid because of the inclusion of the item in income for a prior year. See Healy v. Commissioner of Internal Revenue, *supra* [345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007].

"Nevertheless, the annual accounting concept does not require us to close our eyes to what happened in prior years. For instance, it is well settled that the prior year may be examined to determine whether the repayment gives rise to a regular loss or a capital loss. Arrowsmith v. Commissioner of Internal Revenue, 344 U. S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952). The rationale for the *Arrowsmith* rule is easy to see; if money was taxed at

a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments were generally deductible from receipts taxable at the higher rate applicable to ordinary income. The Court in *Arrowsmith* was unwilling to infer that Congress intended such a result.

\* \* \*

"This result does no violence to the annual accounting system. Here, as in *Arrowsmith*, the earlier returns are not being reopened. And no attempt is being made to require the tax savings from the deduction to equal the tax consequences of the receipts in prior years. In addition, the approach here adopted will affect only a few cases. The percentage depletion allowance is quite unusual; unlike most other deductions provided by the Code, it allows a fixed portion of gross income to go untaxed. As a result, the depletion allowance increases in years when disputed amounts are received under claim of right; there is no corresponding decrease in the allowance because of later deductions for repayments. Therefore, if a deduction for 100% of the repayments were allowed, every time money is received and later repaid the taxpayer would make a profit equivalent to the taxes on 27½% of the amount refunded. In other situations when the taxes on a receipt do not equal the tax benefits of a repayment, either the taxpayer or the Government may, depending on circumstances, be the beneficiary. Here, the taxpayer always wins and the Government always loses. We cannot believe that Congress would have intended such an inequitable result." 394 U.S. at 684–685, 89 S.Ct. at 1383–1384 (Footnotes omitted.)

To like effect see: Commissioner of Internal Revenue v. Anders, 414 F.2d 1283 (10th Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423, rehearing denied, 396 U.S. 1031, 90 S.Ct. 550, 24 L.Ed.2d 528. See also Tennessee Foundry & Machine Co. v. Commissioner of Internal Revenue, 399 F.2d 156 (6th Cir.).

■■■ The Tax Court predicated its opinion in the present case upon the overriding business purpose of the taxpayer in making the payment to General Motors under § 16(b). We find this business purpose to be irrelevant in determining whether the tax benefit doctrine of *Arrowsmith* applies. It is a fundamental rule of taxation that form and labels must yield to reality. The taxpayer here, as in *Skelly Oil*, received income which was taxed at reduced rates, thereby receiving a tax benefit. In the present case, as in *Skelly Oil*, the taxpayer was required to give up a part of that income. Under *Arrowsmith* and *Skelly Oil*, when income is given up, which in its inception was taxed at reduced rates, the taxpayer is not permitted to enjoy preferred treatment twice by deducting in full the extra amount given up as an ordinary deduction.

The taxpayer contends that there is no integral relationship between the 1962 sale, the 1963 purchase and the 1963 payment. This contention is contradicted by his own testimony:

"Q. In 1962, did you have occasion to review your estate plan and wills?

"A. Yes.

"Q. With whom did you conduct this review?

"A. With yourself and Mr. Hupp of the National Bank of Detroit.

"Q. What was the result of such review?

"A. I was advised to make a purchase of stock.

"Q. Were you advised to sell a number of GM stock?

"A. Yes.

"Q. What was the reason for selling the stock?

"A. *To get the money to make the purchase of the stock.*" (Emphasis supplied.)

There can be no doubt that the § 16(b) payment made by the taxpayer to General Motors, even though made for

business purposes, had its inception in the sale of his General Motors stock in 1962. The purpose of the 1962 sale was to "get the money" to exercise the taxpayer's stock option in 1963. Except for the sale of the stock in 1962, which resulted in a long-term capital gain, the alleged violation of § 16(b) and the payment of $17,939.29 to General Motors would never have occurred.

Reversed and remanded.