Charles I. BROWN and Kathleen M. Brown, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 74-1386.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 23, 1975.

Decided Jan. 26, 1976.

Ann Belanger Durney, Atty., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Leonard J. Henzke, Jr., Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent-appellant.

Stanley L. Drexler, Denver, Colo. (Dale W. Haines, Denver, Colo., on the brief), for petitioners-appellees.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

The Commissioner appeals a Tax Court decision, T.C. Memo 1973–275, holding that the taxpayer appellees[1] were entitled to deduct as an ordinary and necessary business expense a payment made by appellee Charles Brown in settlement of an alleged liability to his employer under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b).

The Commissioner argues that Brown was only entitled to a long term capital loss deduction, relying on tax benefit principles applied in *Arrowsmith v. Commissioner of Internal Revenue*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6, and *United States v. Skelly Oil Co.,* 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642. Brown maintains that the tax benefit rule is inapplicable under the undisputed facts found by the Tax Court; that his payment did not stem from a § 16(b) violation; that it is a fallacy that he clearly violated § 16(b) and made the payment to satisfy a liability therefor; that instead his payment was based on his decision "that it would be impossible to contest the suit and simultaneously continue his employment," his motivation being "his fear that litigation would cause adverse publicity and embarrassment to him and [his employer] and would damage his business reputation," as the Tax Court found (R.I. 35); and that his payment represented a separate transaction, in a separate capacity, bearing no necessary relationship to the gain realized by the sale of his employer's stock, unlike the payments in *Arrowsmith* and *Skelly* (Id. at 4–5).

The Tax Court has carefully considered this issue previously in three cases with similar factual circumstances and ruled in favor of the taxpayers, but the courts of appeals have disagreed in each instance. *Cummings v. Commissioner of Internal Revenue*, 61 T.C. 1, rev'd, 506 F.2d 449 (2d Cir.), cert. denied, 421 U.S. 913, 95 S.Ct. 1571, 43 L.Ed.2d 779; *Anderson v. Commissioner of Internal Revenue*, 56 T.C. 1370, rev'd, 480 F.2d 1304 (7th Cir.); *Mitchell v. Commissioner of Internal Revenue*, 52 T.C. 170, rev'd, 428 F.2d 259 (6th Cir.). We agree with the results reached by the courts of appeals and are not persuaded by the Tax Court's opinions in those cases or in this one.

The facts as found by the Tax Court are heavily relied on by Brown. They

---

1. Appellees are Mr. and Mrs. Charles I. Brown, Denver residents, who filed a joint Federal income tax return for 1968, the year in issue.

are not in dispute and we accept them as amply supported. They may be briefly stated.

Since July, 1959, Brown had been employed by Western Nuclear,. Inc., and had been vice president and treasurer at all material times. He had no written contract of employment and served at the directors' pleasure. Western's stock was listed and actively traded on the American Stock Exchange.

Pursuant to three stock option agreements of earlier years Brown purchased 16,000 shares of Western common stock in March, 1966, for $57,569.70. Between January 6, and May 5, 1966, he sold, for $58,325, 3,000 shares of Western common stock which he had bought in 1959 and 1960. and held continuously until the sales in 1966. The sales were made for a total amount of $58,325 and Brown netted $57,420.52 (Ex. 24–X). On their 1966 joint Federal income tax return petitioners reported a long-term capital gain of $49,059.97 on the sales.

Brown sold the 3,000 shares of Western to obtain the cash needed to exercise the options and the proceeds from the sales produced approximately the amount required to exercise the options.

Though Brown was vaguely aware in 1966 that § 16(b) of the Securities Exchange Act of 1934 prohibited the purchase and sale of a corporation's stock within a six-month period by its officers, he believed that the statute did not apply to the exercise of a restricted stock option.

In March, 1968, a Western shareholder, Blau, sued Brown and Western to recover for Western the "short-swing profits" pursuant to § 16(b). When Brown learned of the suit he consulted two attorneys, Western's general counsel and a company retained attorney, who said they could not advise or represent him because they represented Western. They suggested that he should obtain independent counsel.

Brown decided it would be impossible to contest the suit and simultaneously continue his employment with Western. Accordingly he paid Western the full amount of all recoverable damages— $37,795.52. Brown did not engage counsel or answer the complaint. The motivation for his decision not to contest the suit was his fear that litigation would cause adverse publicity and embarrassment to him and Western and would damage his business reputation.

An amended 1968 joint return of the Browns deducted the payments made by Brown as an ordinary and necessary business expense, claiming a $7,598 refund, which the Commissioner disallowed.

On appeal Brown points to additional uncontradicted testimony and a stipulation as showing these facts. Brown had no inside information and did not pick the most opportune time to sell. He did not and does not believe he did anything wrong. He had no opinion whether or not he had any defense to the § 16(b) suit. Also, on the stock he owned he could have borrowed more than enough money to exercise his options. At the time of his latest sale of Western stock his option that would have expired first still had more than four years to run. And Brown refers to his testimony explaining what moved him to exercise the options and make the sales at the particular time he did: that he sold the stock in order to exercise the options, and that the market value of the 3,000 shares bought earlier was very close to what it would take in order to exercise all the stock options (R. II, 16).

The Tax Court said the only question to resolve was whether petitioner made the § 16(b) payments to protect his employment and business reputation. And it found that the facts "clearly establish that petitioner was so motivated in making the aforementioned payments." (R. I, 38). On these facts the court held that Brown's payments were deductible as an ordinary and necessary business expense.

On appeal the Commissioner argues that the payment was made in settlement of an apparent "short-swing" profit violation of § 16(b) and must be deducted as a long-term capital loss since it

represents relinquishment of profit previously taxed as long-term capital gain. These appellate contentions cause us to focus primarily on the undisputed facts concerning this appeal against the background of *Arrowsmith* and *Skelly.*

*Arrowsmith* was a tax controversy growing out of liquidation of a corporation in which two men owned equal amounts of stock. Partial liquidating distributions extended over four years, ending in 1940. Profits from the transaction were reported as capital gains, with less tax paid than for ordinary income. In 1944 a judgment was rendered against the old corporation and one distributee of its stock, Bauer. The two taxpayers were required to pay the judgment for the corporation, being distributees of its assets. The payments were claimed as an ordinary business loss, but the Commissioner disagreed.

The Tax Court sustained the taxpayers' position and rejected the Commissioner's treatment of the payments as a capital loss, which was based on the taxpayers' treatment of the original dividends as capital gains. The court of appeals reversed, upholding the Commissioner and the Supreme Court agreed. The Court said the principle of separate units of annual accounting for tax purposes was not violated by considering all the liquidation events and that " . . . it is plain that [the taxpayer's] liability as transferees was not based on any ordinary business transaction of theirs apart from the liquidation proceedings." 344 U.S. at 8, 73 S.Ct. at 73.

In *United States v. Skelly Oil Co.,* 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642, a similar result was reached. Skelly had raised its gas prices under a minimum field gas price order, which was subsequently vacated. Skelly found it necessary to settle a number of claims for refunds filed by its customers. Two such repayments were claimed in full as deductions. The Commissioner objected, arguing that receipts from the gas sales had been reduced for tax purposes by the 27½% depletion allowance earlier. Ultimately the Commissioner was upheld

by the Supreme Court. Again the Court held that the annual accounting system did not bar examination of the prior events, stating id. at 684–85, 89 S.Ct. at 1383:

> For instance, it is well settled that the prior year may be examined to determine whether the repayment gives rise to a regular loss or a capital loss. *Arrowsmith v. Commissioner,* 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952). The rationale for the *Arrowsmith* rule is easy to see; if money was taxed at a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments were generally deductible from receipts taxable at the higher rate applicable to ordinary income.

We accept as amply supported the ultimate findings of the Tax Court as to Brown's business motivation in making the payments to his employer—"his fear that litigation would cause adverse publicity and embarrassment to him and Western and would damage his business reputation." Nevertheless, in company with the other courts of appeals we are persuaded that the tax benefit principles of *Arrowsmith* and *Skelly* apply here. While the Tax Court did find that Brown was motivated to make the payments and not contest the suit by his fear that litigation would cause adverse publicity and embarrassment to him and Western and would damage his business reputation, nevertheless the underlying liability asserted by the § 16(b) suit cannot be ignored as the origin and basic measure for the payment. We must agree that in light of the object of the statutory liability involved, " . . . if money was taxed at a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments were generally deductible from receipts taxable at the higher rate applicable to ordinary income." *Skelly, supra,* 394 U.S. at 685, 89 S.Ct. at 1383.

On appeal the taxpayer makes two main points. *First,* he says his payment did not stem from a § 16(b) violation and was made in connection with a separate

transaction and in a separate capacity. In connection with this argument he contends that it is wrong to say that he clearly violated § 16(b), as the Government argues, and that instead a rule of the SEC apparently exempted him from the provisions of the statute at the time of the 1966 transactions.[2] These contentions are then tied into the Tax Court's findings relied on heavily: that Brown decided "it would be impossible to contest the suit and simultaneously continue his employment with Western" and that his motivation was "his fear that litigation would cause adverse publicity and embarrassment to him and Western and would damage his business reputation." And Brown says that in both *Arrowsmith* and *Skelly* the taxpayers' liability had been determined, while here he had not even consulted an attorney and only the Internal Revenue Commissioner's determination is before us.

▆▆▆ We cannot agree that the findings and arguments lead to a result favorable to Brown. Similar findings were accepted by the court in *Mitchell v. Commissioner of Internal Revenue,* 428 F.2d 259, 261 (6th Cir.), namely that the payment to the employer corporation was made to avoid injury to business reputation and disadvantage to the taxpayer's career, embarrassment to the employer and himself, and the expense of possible future litigation. However the court found the business purpose irrelevant in determining whether the tax benefit rule of *Arrowsmith* applied, id. at 263, and we agree. Here the triggering factor was the § 16(b) suit, which underlies this case, and the payment is related to proceeds given the earlier beneficial tax treatment. We must agree with the

Sixth Circuit that when such payment is given up, *Arrowsmith* and *Skelly* tell us that the ordinary loss treatment is not available. We feel that the nature of the payment and the prior tax treatment are controlling.

*Second,* Brown contends that the Government relies on a fallacy in arguing that his payment was a relinquishment of profit on the sale of Western stock and similar to adjustments made by the payments in *Arrowsmith* and *Skelly.* More specifically, Brown argues that in *Arrowsmith* the judgment was satisfied because of transferee liability of both taxpayers and that the opinion clearly implied that had there been no transferee liability, an ordinary deduction would have been allowed for amounts paid on account of individual liability stemming from breach of a fiduciary relationship to the judgment creditor, citing 344 U.S. at 9, 73 S.Ct. 71. Brown says he is in a position like that of the individual liable for breach of fiduciary duty there.

We are not persuaded by the argument based on the two asserted capacities. We agree with the court of appeals in *Anderson v. Commissioner of Internal Revenue,* 480 F.2d 1304 (7th Cir.), which rejected the Tax Court's attempted distinction of the taxpayer's capacities "when selling his stock and when disgorging his short-swing profits . ." Id. at 1308. Regardless of the implication in *Arrowsmith,* here the statute imposes a liability focusing on both relationships, that of the officer and the shareholder.

Finally, Brown argues that the sale of his stock and subsequent purchase were two independent transactions. He says

---

**2.** Brown argues that Rule 16b–3 of the SEC, 17 C.F.R. § 240.16b–3, adopted in 1952, exempted from the provisions of § 16(b) the acquisition of shares acquired upon the exercise of nontransferable options, and that apparently the exemption was in effect in 1966 when Brown exercised his options. (Brief for the Appellees, 6).

We believe it clear that an exemption did not apply at the time of the 1966 transactions of Brown. Although the Commission adopted

Rule 16b–3 in 1952 and made exemptions from § 16(b) for stock acquired under options at that time, the rule had been amended by *1965* to exempt only shares acquired pursuant to a stock bonus, profit sharing, retirement, incentive, thrift, savings or similar plan, but the rule then did ". . . not exempt the acquisition of *stock* acquired upon the exercise of *any* option, warrant or right." (emphasis added) See SEC Release No. 34–7559, 30 Fed.Reg. 4127 (March, 1965).

first there was the tax gain realized on the sale of his stock; and that second there is the § 16(b) problem resulting from a purchase subsequent to the completion of the sale and bearing no necessary relation to it. Brown argues that there was no adjustment to the gain transaction as in *Arrowsmith*. (Brief for the Appellees, 13).

The attempt to dissect the transactions is not persuasive. "Bifurcating the sale and payments smacks of artificiality . . ." *Anderson v. Commissioner of Internal Revenue*, 480 F.2d 1304, 1307 (7th Cir.). The interrelationship was clearly recognized in Brown's testimony on his motivation for exercising the options and making the sales at the particular times when he did: ". . . it was in order to exercise the options . . . where . . . am I going to get $60,000? . . . and so I simply sold the 3000 shares and for an almost equivalent amount of money wrote a check to the corporation exercising the purchases and that was the motivation." (R. II, 16). See *Mitchell v. Commissioner, supra,* 428 F.2d at 263–64.

The Court in *Arrowsmith* looked at all the events in the transactions in considering the tax problem, and so must we. We must disagree with the conclusion reached by the Tax Court and its decision is reversed.