*Decision will be entered under Rule 155.*

PAUL H. SMITH AND ARLYN D. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 555–75.  Filed December 22, 1976.

*Allan T. Quello,* for the petitioners.
*Dale L. Newland,* for the respondent.

### OPINION

DAWSON, *Chief Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1971 and 1972 in the amounts of $912.36 and $2,195.68, respectively. The only issue presented for decision is whether payments made by petitioner to settle an action under section 12(1) of the Securities Act of 1933, 15 U.S.C. sec. 77$l$(1)(1970), are so directly related to a sale of unregistered stock in a prior tax year that the recognition of long-term

capital gain on the sale during the prior tax year requires characterization of the payments as long-term capital losses in later years, pursuant to the rule enunciated in *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952).

This case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. All of the facts have been stipulated by the parties. We adopt the stipulation of facts and the exhibits attached thereto as our findings. The pertinent facts are summarized below.

Petitioners Paul H. and Arlyn D. Smith were husband and wife during the taxable years in question. Their legal residence was 13516 Orchard Road, Minnetonka, Minn., at the time they filed their petition in this proceeding. Their joint Federal income tax returns for 1971 and 1972 were filed with the Ogden Service Center at Ogden, Utah.

In 1968, Paul H. Smith (hereinafter referred to as petitioner) owned and operated the Tower Auto Service as a sole proprietorship. He sold the Tower Auto Service proprietorship to Apotec, Inc., on February 8, 1968. In exchange for the Tower Auto Service proprietorship, petitioner received Apotec common stock which had a fair market value of $37,000.

The Apotec common stock certificates did not contain a legend which restricted the transfer of the stock or indicated that the stock was not registered with either the Securities and Exchange Commission of the United States or the State of Minnesota.

Petitioner sold the Apotec common stock on February 17, 1969, to First Northwest Co., a stock broker. Shortly after this sale, First Northwest Co. resold the stock to various parties. The stock was never registered with the Securities and Exchange Commission of the United States. Petitioner sold the stock in 1969 for $75,422, after commissions were paid, and reported $38,422 as long-term capital gain on his 1969 Federal income tax return.

A class action suit was brought in 1971 against the petitioner and others in the United States District Court for the District of Minnesota, Fourth Division. The basis of the action was an alleged violation under section 12(1) of the Securities Act of 1933, 15 U.S.C. sec. 77*l*(1)(1970).

In 1971, petitioner and the other defendants in the action settled with the plaintiffs and filed a settlement stipulation

with the Court. Pursuant to the settlement stipulation, petitioner paid plaintiffs' trust fund $5,000 in 1971 and $12,500 in 1972. Petitioners deducted the $5,000 paid to the trust fund in 1971 and the $12,500 paid to the trust fund in 1972 on their joint Federal income tax returns for 1971 and 1972, respectively, as ordinary losses. Respondent treated the payments as long-term capital losses.

This case involves a determination of the tax character of the settlement payments the petitioner made in 1971 and 1972 to the aforementioned trust fund. Respondent maintains that the recognition of long-term capital gain on the prior tax year sale of Apotec common stock requires that the settlement payments be characterized as long-term capital losses pursuant to the tax benefit rule of *Arrowsmith v. Commissioner*, 344 U.S. 6 (1952). Petitioner, to the contrary, contends that the payments he made to the trust fund represent a separate transaction, and that those payments should be deductible as ordinary losses under section 162(a).[1]

In *Arrowsmith v. Commissioner, supra,* two taxpayers, corporate shareholders, decided in 1937 to liquidate and divide the proceeds of a corporation. They reported the profits obtained upon liquidation as capital gains. In 1944, however, a judgment was rendered against the old corporation and one distributee of its stock. The two taxpayers were required to pay the judgment for the corporation, being transferees of its assets. The taxpayers claimed ordinary business losses for the payments they made. The Commissioner disagreed, viewing the 1944 payment as part of the original liquidation transaction requiring classification as a capital loss since the taxpayers had treated the original dividends as capital gains. The Supreme Court held that the payment was a capital loss because liability was imposed on them as transferees of liquidation distribution assets, a capital transaction; and that the principle of separate units of annual accounting for tax purposes was not violated "by considering all the 1937–1944 liquidation transaction events in order properly to classify the nature of the 1944 loss for tax purposes." *Arrowsmith v. Commissioner, supra* at 8–9.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

The *Arrowsmith* doctrine was broadened considerably in *United States v. Skelly Oil Co.,* 394 U.S. 678 (1969), where an Oklahoma producer of natural gas had raised its gas prices in accordance with a minimum price order of the Oklahoma Corporation Commission. When that order was subsequently vacated, Skelly Oil found it necessary to settle a number of claims filed by its customers. Two such refunds, amounting to $505,536.54, were claimed in full as deductions. The Commissioner objected to Skelly Oil's taking a full deduction upon repayment, arguing that since receipts from the gas sales had previously been reduced for tax purposes by the 27½-percent depletion allowance, the deduction allowable in the year of repayment had to be reduced by that same percentage depletion allowance. The Supreme Court held that the annual accounting system did not bar examination of the events of prior years, stating at pages 684–685:

> Nevertheless, the annual accounting concept does not require us to close our eyes to what happened in prior years. For instance, it is well settled that the prior year may be examined to determine whether the repayment gives rise to a regular loss or a capital loss. *Arrowsmith v. Commissioner,* 344 U.S. 6 (1952). The rationale for the *Arrowsmith* rule is easy to see; if money was taxed at a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments were generally deductible from receipts taxable at the higher rate applicable to ordinary income. The Court in *Arrowsmith* was unwilling to infer that Congress intended such a result.

The tax benefit rule of *Arrowsmith* has also been applied in a group of cases involving the tax characterization of payments resulting from violation of the insider profits provision of section 16(b) of the Securities Exchange Act of 1934. In *Mitchell v. Commissioner,* 428 F.2d 259 (6th Cir. 1970), revg. 52 T.C. 170 (1969); *Anderson v. Commissioner,* 480 F.2d 1304 (7th Cir. 1973), revg. 56 T.C. 1370 (1971); *Cummings v. Commissioner,* 506 F.2d 449 (2d Cir. 1974), revg. 61 T.C. 1 (1973); and *Brown v. Commissioner,* 529 F.2d 609 (10th Cir. 1976), revg. a Memorandum Opinion of this Court, the Courts of Appeals have repeatedly reversed this Court in holding that such payments constituted capital losses because they were integrally related to the prior underlying stock transaction. Contrary to the majority[2] of this Court, the Courts of

---

[2] Six judges dissented in *Nathan Cummings,* 61 T.C. 1, 4–5 (1973).

Appeals have consistently applied the tax benefit rule of *Arrowsmith* to such factual situations.

Here we are confronted with a different provision of our securities laws—section 12(1)[3] of the Securities Act of 1933, 15 U.S.C. sec. 77*l*(1) (1970), which provides the penalty for violation of the registration requirement of section 5[4] of the

---

[3] Sec. 12 provides as follows:

Civil liabilities arising in connection with prospectuses and communications. Any person who—

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

[4] Sec. 5 provides as follows:

Prohibitions relating to interstate commerce and the mails.

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) It shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

Securities Act of 1933, 15 U.S.C. sec. 77(e)(1970). Section 12(1) liability is predicated on the economic loss suffered by purchasers of unregistered stock and their transferees. The measure of damages in a section 12(1) action is the actual or real economic loss suffered by either a party who buys unregistered stock from a shareholder and suffers an economic loss on its resale or a party who is left holding a worthless security.

It is clear from the undisputed facts of this case that there was a direct relationship between the sale of Apotec common stock in 1969 and the payments made by petitioner in 1971 and 1972 to settle the action brought against him and others under section 12(1) of the Securities Act of 1933. The chain of events leading ultimately to petitioner's 1971 and 1972 payments into the trust fund is critical. He received Apotec common stock in exchange for his auto service proprietorship. This stock was sold first to a stockbroker and then to various other individuals. The stock was never registered with the Securities and Exchange Commission. A short while later, petitioner was sued with respect to the sale of his unregistered stock. He settled the law suit by agreeing to make certain payments into a trust fund. Plainly, his payments into the trust fund were directly related to the prior sale of unregistered stock. The two transactions—the earlier sale of stock and the subsequent payments into the trust fund—were "integrally related," and the *Arrowsmith* rule is applicable. Thus, the tax treatment accorded the initial sale of Apotec common stock—capital gains treatment—is controlling, and the payments made by petitioner in 1971 and 1972 must be characterized as long-term capital losses.

In our opinion the relationship between petitioner's gain and the section 12(1) payments is more direct than it was in the cases involving section 16(b) of the Securities Exchange Act of 1934. First, the petitioner was acting in his capacity as a shareholder when he sold his Apotec common stock in 1969 and also when he made the section 12(1) settlement payments in 1971 and 1972. His liability under section 12(1) arose out of a legal action brought against him as a prior shareholder. He was not acting to protect his business reputation; he was merely fulfilling his legal obligation under the agreed settlement. Second, section 12(1) liability arises entirely from

the first sale of stock, while section 16(b) liability arises from a subsequent purchase of stock following its prior sale. Third, unlike the section 16(b) situation, there is no artificial profit created which is owed to a party unrelated to the prior sale transaction. Fourth, as opposed to the situation in a section 16(b) action, the stock purchaser and his transferees in a section 12(1) action are bringing the suit for restitution of their real economic loss. All in all, we think the reasons for characterizing section 12(1) settlement payments as long-term capital losses are more compelling than those for similarly characterizing section 16(b) settlement payments. Accordingly, we hold that the payments made by the petitioner in 1971 and 1972 constituted long-term capital losses because they were directly related to the prior tax year sale of the unregistered stock.

*Decision will be entered for the respondent.*