COLIN F. and ELEANOR M. BEATON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beaton v. Commissioner
Docket No. 1884-77.
United States Tax Court
T.C. Memo 1980-413; 1980 Tax Ct. Memo LEXIS 170; 40 T.C.M. (CCH) 1324; T.C.M. (RIA) 80413; September 22, 1980, Filed *170 (1) In 1968, P sold Q all the stock of B. P continued to serve as the president of B, and in 1973, he misappropriated funds of B. He claimed that Q had defrauded him in the 1968 sale and that he was entitled to compensation for the fraud. Subsequently, P sued to recover his stock, and B sued to recover the funds. In 1977, the litigation was settled; P relinquished his claim to the stock and was permitted to retain the funds. Held, since P did not receive the misappropriated funds as the result of a sale or exchange and since he received the funds in 1973 without the recognition of an obligation to repay and without restriction as to their disposition, such funds were taxable to him as ordinary income in 1973. (2) Held, P is not taxable on imputed interest as a result of the receipt of an interest-free loan in 1973. Greenspun v. Commissioner, 72 T.C. 931 (1979), followed. (3) Held, Ps are liable for an addition to tax under sec. 6651(a), I.R.C. 1954, since they failed to show that the untimely filing of their tax return was due to reasonable cause. (4) Held, Ps are liable for an addition to tax under sec. 6653(a), I.R.C. 1954, since they *171 failed to show that their underpayment of tax was not due to negligence. Kenneth F. Kane, for the petitioners. Thomas P. Dougherty, Jr., for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $50,821.03 in the petitioners' Federal income tax for 1973 and additions to tax for such year of $12,705.26 under section 6651(a) of the Internal Revenue Code *172 of 1954[1] and $2,541.05 under section 6653(a). After concessions by the petitioners, the issues to be decided are: (1) Whether Mr. Beaton is taxable in 1973 on certain funds mis-appropriated by him in that year as ordinary income; (2) whether Mr. Beaton is taxable on imputed interest as a result of the receipt of an interest-free loan from his employer; and (3) whether the petitioners were liable for additions to tax under section 6651(a), relating to late filing of returns, and under section 6653(a), relating to underpayments of tax due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Colin F. and Eleanor M. Beaton, husband and wife, resided in Bridgewater, Mass., when they filed their petition in this case. They filed untimely their joint Federal income tax return for 1973 with the Internal Revenue Service. Mr. Beaton will sometimes be referred to as the petitioner. Sometime prior to the 1960s, the petitioner became the president and sole stockholder of *173 the Brockton Ice and Coal Company, Inc. (Brockton). Brockton had been formed by the petitioner's grandfather and was engaged principally in the sale and distribution of heating oil in the 1960s and 1970s. During such years, Brockton's primary supplier of oil was The Quincy Oil Company (Quinoil). [2]Quinoil sold to Brockton on open account and thereby extended credit to Brockton for the purchases of oil. In late 1964, Brockton's debt to Quinoil totaled approximately $400,000, and Quinoil officials began to fear default. Consequently, they sought security for the debt, and in 1966, they received such security from the petitioner in the form of his personal guarantee of the debt together with a pledge of his stock in Brockton and a mortgage on his residence. By the summer of 1968, Brockton's debt to Quinoil had risen to more than $500,000, and Quinoil contemplated foreclosing upon the security. There was a conference between the petitioner and his counsel and the counsel and officials of Quinoil, and at such conference, the petitioner was presented *174 a proposed agreement for his consideration. After considering the agreement for several days and receiving the advice of his counsel, the petitioner executed the proposed agreement on July 17, 1968. In pertinent part, the agreement provided: the undersigned [the petitioner] does hereby irrevocably assign and transfer to * * * [Quinoil] 875 shares of the Class A Common Stock * * * and 115 shares of the Class B Common Stock * * * of the Brockton Ice and Coal Company, representing all of the issued and outstanding stock of said company as of this date. In return for the petitioner's assignment of his stock, Quinoil promised to "temporarily forebear" collecting under the petitioner's guarantee and mortgage. The agreement also stated that $1 was received as consideration for the transfer of the stock. After the assignment of the petitioner's stock, Quinoil elected the majority of the board of directors of Brockton. The petitioner continued to serve as the president of Brockton, but his powers over financial matters were restricted. For 1969 and later years, Brockton filed consolidated returns with Quinoil, and the petitioner executed such returns as the principal officer *175 of Brockton. The board of directors of Brockton selected a different accounting firm to perform the accounting work of Brockton. In late 1972, the petitioner attempted to repurchase the Brockton stock. He and his counsel and counsel for Quinoil held a meeting in December of that year to negotiate a purchase agreement; however, Quinoil would not sell on the terms proposed by the petitioner, and the meeting was fruitless. Prior to 1973, the petitioner had established B & B Spring Water Company (B & b/), which he wholly owned. B & B was unrelated to Brockton, but in opening its bank account, the petitioner represented to the bank that B & B was a division of Brockton. Between the beginning of 1973 and August of that year, the petitioner had checks payable to Brockton deposited in the B & B account. In the spring of 1973, the petitioner's counsel renewed negotiations for the repurchase of the stock. Another meeting was held with the counsel for Quinoil, but again, the negotiations failed. Thereafter, the petitioner became openly hostile toward Quinoil. When accountants hired by the Brockton board of directors arrived at the company offices to perform their regular audit of *176 the books of Brockton for the fiscal year ending June 30, 1973, the petitioner refused to allow them to enter and told them that he had hired others to replace them. Because of the petitioner's refusal to permit the accountants to conduct their audit, Quinoil decided that he had to be removed, and in late August 1973, the Quinoil counsel, together with local authorities, appeared at the offices of Brockton and announced that the petitioner had been removed from office. During 1973, the petitioner deposited in the B & B account a total of $96,803.33 of the funds belonging to Brockton, and he withdrew $48,585.69 from such account for his personal use. On September 5, 1973, the petitioner filed suit against Brockton, Quinoil, and Quinoil's counsel to recover the Brockton stock. He alleged that the 1968 assignment was not supported by consideration and was fraudulently induced. In November 1973, Brockton brought suit against the petitioner to recover the misappropriated funds. In addition, 2 years later, the petitioner and his son-in-law, who was a signatory on the B & B account and an employee of Brockton, were indicted for stealing and for conspiracy to steal. in June 1977, *177 the litigation was settled. The petitioner relinquished all claims to the Brockton stock and to any property of Brockton; Brockton relinquished all claims against the petitioner, including the claim to the misappropriated funds; and Quinoil relinquished all claims against the petitioner, including those arising under his guarantee of Brockton's debts to Quinoil. Also, Quinoil agreed to discharge the mortgage executed by the petitioner in 1966 and to pay $15,000 to the petitioner. In addition, in September of that year, the criminal charges against the petitioner were dropped. In his notice of deficiency, the Commissioner determined that the Brockton funds misappropriated by the petitioner in 1973 represented additional ordinary income received by him in that year. The Commissioner also determined that the petitioner received an interest-free loan of $123,361.86 from Brockton in 1973 and that since he was not charged interest on such loan, he received additional income of $9,868.95, representing interest at the rate of 8 percent on such loan. In addition, the Commissioner determined that the petitioners were liable for additions to tax under section 6651(a), for filing their *178 return late, and under section 6653(a), for an underpayment of tax due to negligence or intentional disregard of rules and regulations. OPINION The principal issue to be decided is whether the Brockton funds misappropriated by the petitioner in 1973 are taxable to him in that year as ordinary income. The petitioner takes the position that the funds represented partial consideration for his assignment of the Brockton stock, that as such, they are taxable as capital gain, and that such gain was not includable in his income until 1977, when the litigation was settled and he was absolved of any obligation to repay the funds. In support of his position, he contends that his assignment of the stock in 1968 was obtained by fraud and without adequate consideration and that as a result, the transfer was ineffective. He insists that his contention is corroborated by the fact that in settling the litigation, Quinoil permitted him to retain the funds taken by him. Initially, it is clear that the petitioner received income in 1973 when the Brockton funds were misappropriated by him. It is axiomatic that when an individual receives money without the recognition of an obligation to repay *179 and without restriction as to its disposition, he has taxable income in the year it is received, even though he may be required to restore the money later. James v. United States,366 U.S. 213, 219-220 (1961); North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1931); Mais v. Commissioner,51 T.C. 494, 498-499 (1968). Whether the individual receives the money lawfully or unlawfully is irrelevant. James v. United States,supra.This case falls clearly within these principles. First, the record contains no evidence that in 1973 the petitioner recognized an obligation to repay Brockton. Indeed, the petitioner steadfastly maintains that he had a legitimate claim to the funds misappropriated by him.Second, there is no evidence that after the petitioner took the funds and deposited them in the B & B account, he was under any restrictions as to the disposition and use of the funds. In fact, he has admitted that during 1973 he withdrew about half of such funds and that he used them for personal purposes. On the record, we hold that the petitioner is taxable in 1973 on the funds misappropriated by him in *180 that year. There remains the question of whether the funds misappropriated by the petitioner constituted a capital gain or ordinary income. The petitioner recognizes that for the funds to qualify for capital gain treatment under section 1222, they must have been received as a result of a sale of a capital asset. To prevail, the petitioner has the burden of proving that there was no sale of his stock in 1968 (Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933)), and he has failed to convince us that the sale in 1968 was ineffective. The petitioner cites no authority for the proposition that an assignment obtained by fraud is ineffective and not a sale or exchange for tax purposes. What is more, the evidence fails to establish any fraud on the part of Quinoil. The petitioner testified that when he signed the 1968 agreement, he did not understand its effect and that he was led by Quinoil to believe that it was unimportant. Yet, the petitioner's testimony was often vague and inconsistent; whereas, the testimony of the counsel for Quinoil was specific and far more reliable. In fact, the petitioner admitted that he read *181 the 1968 agreement before signing it, and in light of its specific provisions, we cannot believe that he did not understand the effect of the agreement. Moreover, we have found, based on other evidence in the record, that the petitioner actually considered the agreement for several days before signing it and that he had the advice of counsel. The events that occurred after the signing of the 1968 agreement also refute the petitioner's contention. After the assignment, Quinoil elected the majority of a new broad of directors; the representatives of Quinoil chose a new accounting firm for Brockton; the petitioner's powers over financial matters were curtailed; and with the petitioner's knowledge and acquiescence, Brockton filed consolidated Federal income tax returns with Quinoil.These circumstances could not have occurred if the petitioner continued to own all the stock of Brockton, and he must have realized that he no longer owned or controlled Brockton. Thus, we have concluded that the petitioner did sell his Brockton stock in 1968. In view of that conclusion, the petitioner is entitled to treat the funds misappropriated by him in 1973 as capital gains only if he can establish *182 that their receipt was "integrally related" to the sale in 1968 or that they represented an adjustment of the purchase price of the stock. Arrowsmith v. Commissioner,344 U.S. 6 (1952); Smith v. Commissioner,67 T.C. 570 (1976); Federal Bulk Carriers v. Commissioner,66 T.C. 283 (1976), affd. 558 F. 2d 128 (2d Cir. 1977); Lowe v. Commissioner,44 T.C. 363 (1965); Wener v. Commissioner,24 T.C. 529 (1955), affd. 242 F. 2d 938 (9th Cir. 1957). However, to be entitled to capital gain treatment of the payments, the petitioner must make a clear showing of his right to the more favorable treatment. Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). On this record, the petitioner has failed to establish his right to capital gain treatment of the 1973 payments. When the petitioner took the funds in 1973, he treated them as belonging to him. Although he may have felt that he was wronged in the negotiations with Quinoil, there is no evidence that, at the time he took the funds, he had claimed to anyone that he had been defrauded by Quinoil. In fact, *183 he never made that claim until after he had been ousted from Brockton and Quinoil had discovered the misappropriation of the funds. Thus, the claim may have been merely an after-thought to attempt to justify his misappropriation. Nor does the settlement of the litigation confirm his claim. At the time the funds were taken, Quinoil was unaware of the diversion, and it certainly never agreed to the transfer of funds to the petitioner as additional consideration for the sale of his stock. Although the settlement of the litigation allowed him to retain the funds, counsel for Quinoil testified that the company agreed to such settlement because the controversy had been continuing for some years, because the company's legal expenses were increasing, because they had doubt as to whether any judgment could be collected from the petitioner, and because they decided that it was less expensive to settle and let him retain the funds than to continue to press the matter. In view of such testimony, the petitioner has failed to convince us that by the settlement, Quinoil recognized the merits of his claim and agreed that the misappropriated funds should be treated as additional payment for his *184 stock. Hence, we hold that the Brockton funds misappropriated by the petitioner constituted ordinary income received by him in 1973. We deal next with the issue of whether the petitioner received additional income as a result of an interest-free loan by Brockton. The petitioner has not challenged the factual determinations made by the Commissioner in his notice of deficiency. The petitioner relies solely on the argument that as a matter of law, the receipt of an interestfree loan does not constitute the receipt of additional income; he relies on our decision in Dean v. Commissioner,35 T.C. 1083 (1961), in which we so held. The Commissioner vigorously urges us to reconsider our decision in Dean.
This issue was thoroughly examined in our recent decision in Greenspun v. Commissioner,72 T.C. 931 (1979). We examined the rationale for holding that when a taxpayer receives a loan without the obligation to pay interest thereon, or at a preferential interest rate, he receives no income even though the bargain is extended to him in consideration for services performed or to be performed. Although we raised some questions about such rationale, we *185 decided to continue to follow Dean when the taxpayer would be entitled to an interest deduction for any interest paid on the loan. The facts of this case are not significantly different from those in Greenspun, and they present no reason for reconsidering the holding in Dean and Greenspun.Accordingly, we shall follow those holdings, and we hold that the petitioner did not receive any additional taxable income as a result of the interest-free loan by Brockton.
The only other issue to be resolved is whether the petitioners are liable for additions to tax under section 6651(a), for the late filing of their return, and under section 6653(a), for an underpayment of tax due to negligence or to intentional disregard of rules and regulations. The petitioners have the burden of proving that they are not liable for these additions. Enoch v. Commissioner,57 T.C. 781, 802-803 (1972); O'Donohue v. Commissioner,33 T.C. 698 (1960). Here the petitioners wholly failed to address the section 6651(a) addition either at trial or on brief, and they offer no evidence whatsoever to show that they filed their return on time or had sufficient reason to *186 file it late. Accordingly, we sustain the addition to tax under section 6651(a).
With respect to the addition under section 6653(a), the petitioners likewise presented no proof, but on brief, they insist that they acted reasonably in 1973 in reporting none of the misappropriated funds as income, since the character of the income was undetermined at that time. However, as we have said, it is axiomatic that an item is returnable as income in the year it is received under these circumstances. See also sec. 1.451-1(a), Income Tax Regs. We have no evidence that the petitioners believed in good faith that this rule did not apply to them, or that they made a reasonable attempt to determine the proper tax treatment of the misappropriated funds. We cannot believe that the petitioners did not anticipate any tax consequences in 1973 upon the receipt of almost $100,000. Therefore, the addition to tax under section 6653(a) is also sustained. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect in 1973.↩
2. The Quincy Oil Company changed its name to Quinoil Industries, Inc., in 1969. We shall refer to the company as Quinoil.↩